[No. E007301. Fourth Dist., Div. Two. Oct. 1, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
TERRY WAYNE JONES, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III, IV and V.

1304

## COUNSEL

Robert F. Howell, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Maxine P. Cutler and Barry J. T. Carlton, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

TIMLIN, J.—Defendant appeals from the judgment entered upon his convictions of one count of the crime of attempted murder (Pen. Code §§ 664, 187, subd. (a)), one count of the crime of possession of a firearm by a felon (Pen. Code, § 12021, subd. (a)) and one count of the crime of possession of a statutorily designated weapon (Pen. Code, § 12020, subd. (a)).[1] The attempted murder conviction was accompanied by the following special/ sentence enhancement true findings: (1) That defendant's attempt to commit murder was an attempt to commit willful, deliberate and premeditated

---

[1]Unless otherwise indicated, all statutory citations refer to the Penal Code as it was worded in 1988.

murder within the meaning of section 664, subdivision 1 (life imprisonment with the possibility of parole); (2) that defendant personally used a firearm within the meaning of sections 1203.06, subdivision (a)(1)(i) (probation ineligibility), 12022.5, subdivision (a) (two-year sentence enhancement) and 1192.7, subdivision (c)(8) (definition of "serious felony" with respect to limitations on plea bargaining); (3) that defendant, with the intent to do so, personally inflicted great bodily injury on a victim within the meaning of sections 12022.7 (three-year sentence enhancement) and 1192.7, subdivision (c)(8) (see, *supra*); (4) that defendant, with the intent to do so, personally inflicted great bodily injury on a victim as a result of discharging a firearm from a motor vehicle within the meaning of sections 12022.55 (five-year sentence enhancement) and 1192.7, subdivision (c)(8) (see, *supra*); and (5) that defendant had suffered a prior conviction of a serious felony within the meaning of section 667, subdivision (a) (five-year sentence enhancement). Defendant's sentence was also generally enhanced by a true finding that he had served a prior separate prison term within the meaning of section 667.5, subdivision (b) (one-year sentence enhancement).

On appeal, defendant has raised five distinct contentions: (1) The trial court prejudicially erred by not instructing the jury on the alleged lesser included offense of attempted second degree murder; (2) the trial court prejudicially erred by not instructing the jury on the defense of "accident and misfortune"; (3) the trial court prejudicially erred by admitting certain post-shooting statements by defendant into evidence; (4) the trial court prejudicially erred by sentencing defendant both on the attempted murder count and on the "felon in possession of a firearm" count; and (5) the abstract of judgment incorrectly indicates that defendant's sentence was enhanced as the result of a true finding under section 667.6, subdivision (a), rather than under section 667, subdivision (a). As we discuss below, we conclude that only defendant's fifth contention has merit. We will affirm the judgment actually entered by the trial court, and will remand the matter to the trial court with directions that a corrected abstract of judgment be prepared and disseminated to the appropriate correctional authorities.

FACTS

We set forth the facts of this case having viewed the evidence contained in the record on appeal "in the light most favorable to the judgment below." (*People* v. *Rich* (1988) 45 Cal.3d 1036, 1081 [248 Cal.Rptr. 510, 755 P.2d 960].)

Defendant was released on parole from a term in state prison on June 4, 1988. One of the conditions of his parole was that defendant remain in the

Sacramento area. Defendant immediately left the Sacramento area and returned to the San Bernardino area.

Just a little over one month later, at approximately midnight on the evening of July 7, 1988, defendant was asked by an acquaintance (Lemons) to assist him in removing a power steering unit from an (according to Lemons) abandoned car. Defendant agreed to help Lemons with the car, and took a single-shot, sawed-off shotgun with him when he left with Lemons to do so.[2] En route to the abandoned car, Lemons noticed that he and defendant were being followed by a law enforcement patrol car. (Lemons knew that the registration tags on the car he was driving had expired and that the driver's side taillight was broken and covered over with red tape.) Lemons mentioned the fact that they were being followed to defendant, who told Lemons to keep driving.

Deputy Sheriff Manker (Manker) was the sole officer in the patrol car following Lemons. Manker noticed the expired registration tags and broken taillight on Lemons' car and, after following Lemons' car for three or four blocks, he activated his emergency lights and pulled Lemons' car over. Lemons exited the car and walked back to the patrol car. Manker asked Lemons for driver's license identification, whereupon Lemons produced an expired temporary driver's license. Manker then asked Lemons for the car's registration certificate and for proof of insurance. As Lemons returned to his car to search for the additional documents requested by Manker, Manker himself exited his patrol car and, following directly behind Lemons, approached Lemons' car on the driver's side.

Manker observed Lemons searching through the glove box of the car for the additional documents while he (Manker) shined a flashlight in the car. Defendant sat quietly in the front passenger seat of the car; the shotgun was not in plain sight. Manker walked behind the car and approached the passenger-side door of the car. Shining his flashlight into the car, Manker asked defendant for identification. Without turning to look at the officer, defendant reached back with his left hand to the left rear pocket of his pants and took out his wallet. Placing the wallet in his right hand, defendant removed a driver's license from the wallet with his left hand and extended

---

[2]Lemons was not at first aware that defendant possessed the shotgun. It was not until the two of them had been together in Lemons' car for a little while that Lemons first noticed the gun. Defendant seemed casual about the presence of the gun and made no attempt (then) to hide it.

At his trial, defendant testified that he took the shotgun with him as a measure of self-protection—that he had beaten another man in a fistfight earlier the same day and that he (defendant) had later heard that the other man was armed and threatening to shoot defendant if the two of them met again.

the license to Manker through the open window of the car door. Defendant then placed the wallet down on his right knee, freeing his right hand.

Manker examined the driver's license proffered by defendant and observed that it belonged to someone else (or, at least, had someone else's picture on it). Manker asked defendant for other identification, to which request defendant replied that he had some more identification. Defendant reached across with his left hand toward the wallet on his right knee, defendant's right hand in the meanwhile having dropped down into the space between the passenger seat and the passenger-side door. Rather than grasping his wallet, however, defendant continued to reach across his body with his left hand and grasped the door handle.

Opening and swinging the car door wide with his left hand, defendant raised the shotgun from the space between the passenger seat and the passenger-side door and pointed it in the direction of Manker's head with his right hand. Manker made a sweeping motion with his left hand to try to knock the shotgun barrel away. At just that moment, the shotgun went off, striking Manker in the left wrist, arm and lower chest.

Manker was momentarily dazed. When he regained awareness of his surroundings, he found himself lying on the ground at the back end of Lemons' car and he heard Lemons yelling at (ostensibly) defendant about having shot the officer. Manker looked around, saw defendant and started to shoot at him. Defendant started to run away and Manker saw him (defendant) stagger as if he had been struck by one of Manker's shots.

Lemons came to Manker's assistance. Lemons held Manker's "handie talkie" radio to Manker's mouth so that Manker could radio for help. Soon thereafter, law enforcement personnel arrived and Manker was rushed away to receive medical attention.

During the interim, defendant had approached a residence in the surrounding neighborhood and had asked a man there for assistance. Defendant was bleeding from gunshot wounds. The man administered first aid to defendant and told him that he (the man) would go and borrow a car to give defendant a ride to the hospital. The man went outside, approached the law enforcement personnel who were gathered at the scene of the shooting and told them that a wounded man was in his house. The officers shortly thereafter entered the man's house and arrested defendant. As he was being arrested, defendant spoke to the arresting officer and said: "Okay, don't shoot. I didn't mean to

shoot him. He shot me six times."[3] It was now approximately 1 o'clock in the morning of July 8.

Defendant was taken to a hospital for treatment of his gunshot wounds. Defendant was kept under constant law enforcement surveillance while in the hospital. At approximately 9 o'clock in the morning of July 8, one of the officers keeping watch over defendant heard him make three separate statements:

(1) "You guys better kill me 'cause this is just making it worse. I'm going to explode one of these days and kill one of you mother fucking cops."

(2) "I was trying to get out of the car because I had a warrant, violation, and the damn cop starts shooting me, not the other fellow."

(3) "I'll spend my entire lifetime cutting your mother fuckin' heads off."

Defendant was thereafter charged with one count of attempted murder, one count of possession of a firearm by a felon and one count of being in possession of a statutorily designated weapon (a sawed-off shotgun). (See opening statement of this opinion.) These counts were attended by numerous special/sentence enhancement allegations. (*Ibid.*)

In his first trial, defendant was convicted by a jury of the one count of "felon in possession" and of the one count of "possession of a sawed-off shotgun." Also at this trial, defendant admitted to the trial court in a bifurcated proceeding that he had indeed served a prior separate prison term within the meaning of section 667.5, subdivision (b). However, the jury in this first trial "hung" on the attempted murder count. The trial court declared a mistrial on that charge, and the matter was recalendared for another trial.

Defendant was retried on the attempted murder charge, attended by all of the previously enumerated special/sentence enhancement allegations relating to that charge. The jury in this second trial convicted defendant of attempted murder and found true all of the attendant special/sentence enhancement allegations submitted to it for determination—the only exception being the allegation of a prior conviction within the meaning of section 667, subdivision (a), which allegation was found true by the trial court in a bifurcated proceeding.

---

[3] It was later determined that Manker had wounded defendant three times.

The trial court sentenced defendant as follows:

(1) Attempted willful, unlawful, deliberate and premeditated murder (§§ 664/187, subd. (a))—indeterminate sentence of life with the possibility of parole.

(2) Personal use of firearm (§§ 1203.06, subd. (a)(1)(i), 12022.5, subd. (a), 1192.7, subd. (c)(8))—two years (stayed).

(3) Personal infliction of great bodily injury with intent (§§ 12022.7, 1192.7, subd. (c)(8))—three years (stayed).

(4) Personal infliction of great bodily injury with intent as a result of discharging a firearm from a motor vehicle (§§ 12022.55, 1192.7, subd. (c)(8))—five years.

(5) Prior conviction of a serious felony (§ 667, subd. (a))—five years.

(6) Possession of a firearm by a felon (§ 12021, subd. (a))—three years.

(7) Unlawful possession of a statutorily designated weapon (§ 12020, subd. (a))—three years (stayed).

(8) Prior separate prison term served (§ 667.5, subd. (b))—one year.

In total, defendant was sentenced to state prison for an indeterminate life sentence (with possibility of parole) consecutive to a 14-year determinate sentence.

As noted at the outset of this opinion, defendant has raised five distinct contentions on appeal. We will address each of these contentions in turn. Additional facts will be referred to, as needed, in the discussion which follows.

## DISCUSSION

### I.

### FAILURE TO INSTRUCT ON "ATTEMPTED SECOND DEGREE MURDER"

Defendant contends that the evidence adduced at trial in this case justified the giving of a jury instruction on "attempted second degree murder," and that the trial court's failure to do so sua sponte was error. Defendant's argument in support of this contention is essentially twofold: (a) The trial

court was obligated to give the instruction sua sponte because "attempted second degree murder" is a lesser included offense of "attempted first degree murder" and there was evidence adduced at trial upon which a reasonable juror could have concluded that defendant, if he was guilty of attempted murder at all, was guilty only of "attempted second degree murder" (that is, an attempted unlawful killing of a human being with malice aforethought and intent to kill);[4] and (b) the failure to instruct on "attempted second degree murder" actually misled the jury to defendant's prejudice in that the failure left the jury to conclude that, if it decided to convict defendant of attempted murder, it must convict defendant of "attempted first degree murder" (that is, an attempt to commit a willful, deliberate and premeditated murder). Defendant's argument fails in both respects.

First, the trial court did not err in failing to instruct the jury as to a lesser included offense of "attempted second degree murder" because the law does not recognize the existence of such a crime. (*People* v. *Douglas* (1990) 220 Cal.App.3d 544, 549 [269 Cal.Rptr. 579], review den. Aug. 30, 1990, cert. den. __ U.S. __ [115 L.Ed.2d 1002, 111 S.Ct. 2833]; see *People* v. *Cooper* (1991) 53 Cal.3d 771, 832 [281 Cal.Rptr. 90, 809 P.2d 865], wherein our Supreme Court cited the *Douglas* opinion "regarding the law today" on the issue of whether the crime of attempted murder is divided into degrees.)[5]

Defendant argues that *Douglas* is incorrectly decided because the *Douglas* court's determination that attempted murder is not divided into degrees is based, in large part, on its conclusion that "the Legislature has not expressly provided for same" (*Douglas, supra,* 220 Cal.App.3d at p. 549)—while, in fact, the Legislature *has* expressly provided for "same." Defendant asserts that section 664, subdivision 4, is exactly such an express legislative provision. Section 664, subdivision 4, provides: "*If a crime is divided into degrees, an attempt to commit the crime may be of any such degree,* and the punishment for the attempt shall be determined as provided by this section." (Italics added.) Defendant's argument on this issue is, at the very least, plausible. However, we are disinclined to take issue with *Douglas* in the face of our

---

[4]See, generally, *People* v. *Wickersham* (1982) 32 Cal.3d 307 [185 Cal.Rptr. 436, 650 P.2d 311].

[5]We have referenced *Douglas*'s subsequent review history with the following observation made by our Supreme Court in mind: "Although this court's denial of a hearing is not to be regarded as expressing approval of the propositions of law set forth in an opinion of the District Court of Appeal or as having the same authoritative effect as an earlier decision of this court [citations], it does not follow that such a denial is without significance as to our views [citations]." (*DiGenova* v. *State Board of Education* (1962) 57 Cal.2d 167, 178 [18 Cal.Rptr. 369, 367 P.2d 865].) This observation would seem to be borne out by our Supreme Court's subsequent reference to *Douglas* in the *Cooper* opinion (see main text).

Supreme Court's recent approving reference to *Douglas* in the *Cooper* opinion (*supra*).[6]

Second, a review of the record on appeal as a whole has convinced us beyond a reasonable doubt that the jury was *not* confused and misled by the absence of an instruction on "attempted second degree murder" into believing that, if it decided to convict defendant of attempted murder *at all*, it had to convict defendant of willful, deliberate and premeditated attempted murder. Consequently, even if the failure to instruct on "attempted second degree murder" was error, it was harmless error beyond a reasonable doubt.

In large part, defendant's argument in this regard is based on the fact that the amended information upon which the second trial was brought (which information was read to the jury) charged the attempted murder as an "attempted willful, deliberate, premeditated murder"—thus suggesting that "willful, deliberate, premeditated" were necessary elements of the attempted murder charge itself rather than elements of a special allegation attending the attempted murder charge. If this had been the *only* "instruction" on this issue received by the jury, we might be somewhat more concerned than we are about the possibility of the jury having been misled. However, the amended information was *not* the only "instruction" received by the jury concerning the interplay between the attempted murder charge and the "willful, deliberate, premeditated" special allegation. The jury was *also* told:

(1) By both trial counsel during final/closing argument, that the special allegation of "willful, deliberate, premeditated" murder was only reached if and after the jury had found defendant guilty of attempted murder.

(2) By the trial court during the giving of jury instructions, what the elements of the crime of "attempted murder" are—elements that do not include "willful, deliberate, premeditated." The trial·court further informed the jury at that same time that the "willful, deliberate, premeditated" allegation was "also alleged" in Count 1—conveying the impression that the special allegation was alleged "in addition to" the attempted murder charge rather than as a part of it.

(3) By the trial court as a further part of the jury instructions:

<hr>

[6]We realize that in *Cooper* our Supreme Court was concerned with a crime which was committed (and with statutory criminal law as it was worded) prior to the 1986 amendment of section 664, subdivision 4—and that, to the extent the Supreme Court's reference to *Douglas* was intended to be an explication of the current state of the law, the Supreme Court's reference constitutes dicta. However, we find such dicta to be particularly persuasive because it was pronounced in the context of a Supreme Court examination into the precise issue here in question—whether attempted murder is divided into degrees.

"In this case there are three possible verdicts as to Count 1, and two possible verdicts as to each special allegation. These various possible verdicts are set forth in the forms of verdicts which you will receive. Only one of the possible verdicts may be returned by you as to any particular count or special allegation."[7] This differentiation between the underlying attempted murder charge and the attendant special allegations further clarified the fact that "willful, deliberate, premeditated" was not an element of the attempted murder charge itself.

(4) By the verdict forms themselves, that the attempted murder charge and the "willful, deliberate, premeditated" special allegation were distinctly independent of each other. The jury returned a separate special verdict finding defendant guilty of attempted murder, using for that purpose a special verdict form that defined attempted murder without reference to "willful, deliberate, premeditated." The jury also returned a separate true finding with regard to the special allegation that defendant's attempt to murder Manker had been "willful, deliberate, premeditated." Finally, the jury had had before it during deliberations separate verdict/finding forms on which it could have indicated not guilty (of attempted murder) and not true (that the attempted murder was "willful, deliberate, premeditated").

Given all of the above, no credible argument can be made that the jury was confused and/or misled into supposing that a conviction of attempted murder necessitated a finding that the attempt was "willful, deliberate, premeditated."

The trial court did not err in not instructing on "attempted second degree murder" as a lesser included offense of the crime charged—and, even if the failure to so instruct were to be considered error, it was surely harmless error in this case.

## II.

### FAILURE TO INSTRUCT ON DEFENSE OF ACCIDENT AND MISFORTUNE

██ Defendant contends that the trial court committed prejudicial error by failing to instruct the jury sua sponte on the defense of "accident and misfortune." (CALJIC No. 4.45; see § 26, subd. Five.)

---

[7]As to the special/sentence enhancement allegations, the trial court properly should have referred to proposed "finding" forms (not "verdict" forms), but we do not believe that this incorrect appellation in any way misled the jury in the manner argued by defendant.

■ The seminal authority in this area of the law is *People v. Sedeno* (1974) 10 Cal.3d 703 [112 Cal.Rptr. 1, 518 P.2d 913]:[8] "The duty to instruct, *sua sponte*, on general principles closely and openly connected with the facts before the court also encompasses an obligation to instruct on defenses . . . and on the relationship of these defenses to the elements of the charged offense. . . . [¶] Unlike the rule obliging the court to instruct on lesser included offenses . . . , the duty to give instructions, *sua sponte*, on particular defenses and their relevance to the charged offense arises only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." (*Id.* at p. 716.)

It is true that the primary thrust of the defense mounted by defendant in trial was that the shotgun discharged by accident, as a result of being struck by Manker. It is equally true that there was sufficient evidence adduced at trial (defendant's testimony) that a reasonable juror could have concluded, were defendant believed, that defendant had no criminal intent in acting as he had when the shotgun discharged. Thus, on the face of it, the trial court was obligated to instruct the jury sua sponte on the defense of accident and misfortune and it was error for the trial court to have failed to do so.

However, the trial court's error was not prejudicial. ■ One element of *Sedeno*'s broad-ranging analysis of sua sponte instructional obligation is an analysis of the prejudicial effect produced in those cases where, although a proper instruction is omitted, *other* proper instructions adequately guide the jury in reaching factual determinations on those issues which would have been presented to the jury by the omitted instruction: "Thus, in some circumstances it is possible to determine that although an instruction on a lesser included offense was erroneously omitted, the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context, and there can be no prejudice to the defendant since the evidence that would support a finding that only the lesser offense was committed has been rejected by the jury." (10 Cal.3d at p. 721.) Just such an analysis applies in this case.[9]

---

[8]*Sedeno* was disapproved on another ground in *People v. Flannel* (1979) 25 Cal.3d 668, 684-685, footnote 12 [160 Cal.Rptr. 84, 603 P.2d 1].

[9]Of course, the above passage quoted from *Sedeno* concerns the giving of instructions on lesser included offenses while this case concerns the omission of instructions on a defense. However, this is a "distinction without a difference." As acknowledged by *Sedeno* (10 Cal.3d at p. 716), the general principles surrounding the duty to give sua sponte instructions in a criminal case apply to both offenses and defenses. Further, it must surely be conceded that, if the "necessarily decided under other proper instructions" exception to reversibility exists for instructions on criminal *offenses* (on each element of which the People bear a "beyond a

 The jury in this case was properly instructed:

(1) That to convict defendant of attempted murder, it had to find that defendant "harbored . . . a specific intent to kill unlawfully another human being." The jury implicitly made this finding when it convicted defendant of attempted murder.

(2) That it had to determine the truth *vel non* of the charged allegation that the attempted murder was "willful, deliberate and premeditated." "Willful" was properly defined for the jury as meaning "intentional." "Deliberate" was properly defined for the jury as meaning "formed or arrived at or determined upon as a result of careful thought and weighing consideration for or against the proposed course of action." "Premeditated" was properly defined for the jury as meaning "considered beforehand." The jury was further properly instructed that an attempt to commit a willful, deliberate and premeditated murder was an attempt to commit a murder that was "preceded and accompanied by a clear deliberate intent to kill, which was the result of deliberation and premeditation so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation." The jury found true the allegation that defendant attempted to commit a willful, deliberate and premeditated murder.

(3) That, if the jury found defendant guilty of attempted murder or a lesser included offense, it (the jury) must determine the truth *vel non* of the special allegation that defendant intentionally inflicted great bodily injury on Manker. The jury found true the allegation that defendant intentionally acted in such a manner.

(4) That, if the jury found defendant guilty of attempted murder or a lesser included offense, it (the jury) must determine the truth *vel non* of the special allegation that defendant intentionally inflicted great bodily injury on Manker by discharging a firearm from a motor vehicle. The jury found true the allegation that defendant intentionally acted in such a manner.

Given the above findings by the jury, it is clear, beyond credible argument, that the jury necessarily rejected the evidence adduced at trial that would have supported a finding to the effect that defendant's "accident and misfortune" defense (meant to establish that the discharge of the shotgun had not

reasonable doubt" burden of proof), the same exception must be deemed to exist for criminal defenses (which, in large part, merely serve to negate the existence of one or more of the elements of the charged offenses).

been attended by any criminal intent or purpose) was valid, thus implicitly resolving the question of that defense adversely to defendant. Consequently, the trial court's failure to instruct sua sponte on that defense was harmless beyond a reasonable doubt. (*Sedeno, supra,* 10 Cal.3d 703; *People* v. *Jennings* (1991) 53 Cal.3d 334, 387 [279 Cal.Rptr. 780, 807 P.2d 1009], petition for writ of certiorari to the United States Supreme Court pending.)

III.-V.*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment as pronounced by the trial court is affirmed in full. This matter is remanded to the trial court with directions that the abstract of judgment be corrected in accordance with this opinion and that the same thereafter be forwarded to the appropriate correctional authorities.

Dabney, Acting P. J., and McDaniel, J.,† concurred.

---

*See footnote, *ante,* page 1303.

†Retired Associate Justice of the Court of Appeal, Fourth District, sitting under assignment by the Chairperson of the Judicial Council.