[No. B122817. Second Dist., Div. Two. Aug. 19, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
TIMOTHY GONZALES, Defendant and Appellant.

## COUNSEL

Cynthia L. Barnes, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Jaime L. Fuster and Martin L. Pitha, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

MALLANO, J.*—Timothy Gonzales appeals from the judgment entered following a jury trial that resulted in his conviction of willful infliction of corporal injury on a cohabitant (Pen. Code, § 273.5, subd. (a)) and his admission that he had a prior robbery conviction (Pen. Code, § 211) that was alleged as a qualifying prior felony conviction under the three strikes law (Pen. Code, §§ 667, subds. (b)-(i), 1170.12). He was sentenced to a total prison term of eight years and ordered to pay a $200 restitution fine under Penal Code section 1202.4, subdivision (b).

Appellant contends that the trial court erred in failing to instruct the jury sua sponte regarding the defense of accident. Respondent contends that the trial court erred in failing to impose a $200 parole revocation fine pursuant to Penal Code section 1202.45.

### FACTUAL AND PROCEDURAL BACKGROUND

Michaela M. testified that in early July 1997 she was living with appellant, who was her boyfriend, and she was pregnant with his child. Michaela was 18, and appellant was 36. Between 1:00 a.m. and 2:00 a.m. on July 4, 1997, appellant woke her up and told her to prepare something for him to eat. When she refused, he poured water on her. She then poured water on him, and he punched her in the stomach several times. Michaela ran to the

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

bathroom and locked the door. Appellant kicked the door open. When he did so, the door struck her in the head, causing a bump on her forehead. She also had abdominal cramps. She went to the front door to leave, and appellant pulled her hair, punched her in the nose, and hit her head against the wall. Appellant's brother told appellant to stop hitting her. Michaela went outside and vomited. She then went to appellant's mother's house. As a result of that incident, Michaela had bruises under her eyes and a swollen nose.

On July 5, Michaela left a message on her mother's answering machine, stating that appellant had beaten her. Michaela's uncle took her home to her mother, with whom she had a "rocky" relationship. Michaela was still living with her mother during the trial. When Michaela went to the hospital, the hospital called the sheriff's department. Michaela told a sheriff's deputy what happened and stated that she did not want to press charges. Michaela's mother wanted her to press charges. When appellant was in jail, Michaela sent him a letter in which she stated that she wrongfully accused him of things. She testified that, in writing that comment, she had been referring to accusations regarding other women concerning whom she was jealous, not the accusations that resulted in his arrest.

At the preliminary hearing, Michaela had testified that her injuries were caused by an accident. She had asserted that the door struck her as she was leaving the room and appellant was entering it and that appellant did not assault her. She had specifically denied that appellant grabbed her by the hair, hit her in the face, threw her against the wall, kicked her in the legs, or punched her in the stomach.

Michaela testified that after appellant was arrested, he proposed marriage to her. She was trying to protect him when she testified at the preliminary hearing, because she loved him and wanted the baby to have a father. However, after the baby was born, Michaela was no longer trying to protect appellant. Her attitude had changed, because she thought about how appellant could have injured the baby.

Michaela's mother, Rhonda G., testified that Michaela left a message stating that appellant had beaten her and that she wanted to come home. When Michaela arrived home, she had bruised eyes, a huge knot on her forehead, and a swollen nose. Michaela's mother had not liked that Michaela and appellant were living together. Michaela had previously come home after arguing with appellant and had then left and resumed living with appellant. Rhonda had told Michaela that if she lived with appellant again, Michaela should not call her when she had trouble.

Los Angeles County Sheriff's Deputy Michael Walth testified that on July 6 at the hospital, Michaela said that appellant had punched her in the upper

body and face, that he had kicked in the bathroom door, causing it to strike her in the face, and that he had struck her in the stomach and kicked her legs. She had a large lump on her forehead. Hospital records indicated that she had a "mild" contusion of the abdominal wall on the right.

Michael A., Michaela's uncle, testified that on July 5, Michaela called him, said she was calling from a pay phone, told him appellant had beaten her, and asked Michael to pick her up. Michaela told Michael that appellant had dragged her out of bed and assaulted her. She stated that appellant had hit and kicked her in the stomach.

In appellant's defense, Julio M., appellant's brother, testified that between 1:00 a.m. and 2:00 a.m. on July 4, 1997, he heard Michaela yell at appellant, heard a door slam, and saw appellant go toward the bathroom. He later saw Michaela standing in front of appellant in the bathroom. There was a red line on her forehead. Michaela told Julio that she had gotten hit by the door and that the injury was caused by an accident. Julio did not see appellant hit Michaela and did not tell appellant to stop hitting her. The doorframe was not broken. Although Julio did not tell the police that Michaela had said her injury was caused by an accident, he was never interviewed by the police.

Appellant's mother, Delfina M., testified that on July 4 Michaela told her that she accidentally hit her head on the bathroom door when appellant was coming into the bathroom. Michaela did not state that appellant beat her or kicked her legs. Delfina did not notice any damage to the bathroom door. When sheriff's deputies came to the house to look for appellant, she told a deputy that Michaela's injury was caused by an accident.

Jacqueline G., appellant's sister, testified that about July 19, 1997, Michaela called her, and Jacqueline inquired why the police were looking for appellant. Michaela stated that her mother and stepfather had taken her to the hospital and told her to say that appellant had beaten her. Michaela told Jacqueline that appellant had not beaten her. Michaela had claimed that appellant beat her, because her parents had threatened to kick her out if she did not say that. Jacqueline was employed as a typist-clerk at the sheriff's department, but did not tell any detective that Michaela had said she was not beaten.

In rebuttal, Deputy Walth testified that, when the deputies looked for appellant at his home on July 6, appellant's mother did not state that Michaela's injury was caused by an accident or that Michaela had said her injury was caused by an accident.

During closing argument, defense counsel urged the jury to find appellant not guilty because Michaela's injuries were caused by an accident. However,

defense counsel did not request that the jury be instructed regarding the defense of accident, and the trial court did not instruct the jury regarding that defense.

During his argument to the jury, defense counsel stated: ". . . Ms. [M.] gave about five versions of what happened. [¶] The first one was on July 4, 1997. The first person who saw Ms. [M.] was Julio [M]. Julio testified to you that Michaela [M.] said, [']Wait, it was all an accident. Nothing happened.['] [Julio also testified, ']And I didn't see [appellant] hit her at all.['] [¶] Then you have testimony from Delfina [M.], who said Michaela said it was all an accident. . . . [¶] Then there is Jacqueline [G.], who spoke to Michaela two weeks later on the phone, [during] which [conversation] Michaela said[,] [']Nothing happened. It was an accident. In fact, my parents want me to prosecute this case.['] . . . [¶] . . . [At the preliminary hearing,] Michaela [M.] . . . testified . . . that nothing had occurred. [¶] She said, 'I was coming out like I was going to walk out the door and he was coming in. And when he opened the door[,] I was standing right there.' [¶] When she was asked whether her hair was grabbed, she said, 'No.' [¶] 'Were you ever thrown against the wall?' [¶] She said, 'No.' [¶] 'Were you at any time kicked in your legs?' [¶] 'No.' [¶] 'Did he at any point punch you in the stomach?' [¶] 'No.' [¶] She testified under oath nothing had occurred. . . . [¶] . . . There are no independent witnesses who say they saw [appellant] hit or strike Michaela. . . . [¶] The defense in this case is simple. [Appellant] didn't do it. . . . [¶] Julio said he merely tried to quiet down the argument so his children could sleep. . . . He said he never saw [appellant] beat on Michaela. He says he never saw the door of the bathroom sustain any damage[] [¶] Delfina [M.] also testified that again Michaela told her it was all an accident. [¶] We heard testimony about why didn't Delfina tell the police if she had this information that it was all an accident . . . ? [¶] [I]f the victim all the way up until trial says she wants to drop the charges, does not want to press charges, and even at the preliminary hearing says it didn't happen, and the district attorney's office does not dismiss this case, do you think there is any chance they'll dismiss this case based on Delfina [M.'s] cries to the district attorney this was an accident[,] Jacqueline [G.'s] telling the police or district attorney's office it's all an accident, or Julio [M.'s] statement to the police this was all an accident? . . . [¶] [The defense witnesses] gave statements to [the defense] investigator so they can preserve testimony and so they can tell you the truth, that this was all an accident. . . . [¶] . . . [Appellant's relatives] took an oath and told you the truth. This was an accident."

The jury was instructed with a modified version of CALJIC No. 9.35 (6th ed. 1996 bound vol.) in pertinent part as follows: ". . . Every person who

willfully inflicts upon a person with whom he is cohabiting or any person who is the mother of his child corporal injury resulting in a traumatic condition is guilty of a violation of Section 273.5 of the Penal Code . . . . [¶] In order to prove this crime, each of the following elements must be proved: [¶] 1. A person willfully inflicted bodily injury upon his spouse[,] another person with whom he was cohabiting or any person who was the mother of his child; and [¶] 2. The bodily injury resulted in a traumatic condition." The jury was instructed with a modified version of CALJIC No. 16.140 (6th ed. 1996 bound vol.) regarding the lesser included offense of simple battery as follows: "Every person who willfully uses any force or violence upon the person of another is guilty of the crime of misdemeanor battery in violation of Penal Code Section 242."

The jury was instructed with CALJIC No. 3.30 (6th ed. 1996 bound vol.) as follows: "In the crime charged in Count 1, namely, CORPORAL INJURY TO COHABITANT, and the crime of BATTERY, which is a lesser crime, there must exist a union or joint operation of act or conduct and general criminal intent. General intent does not require an intent to violate the law. When a person intentionally does that which the law declares to be a crime, he is acting with general criminal intent, even though he may not know that his act or conduct is unlawful."

The jury was also instructed with CALJIC No. 1.20 (6th ed. 1996 bound vol.) regarding the definition of "willfully" as follows: "The word 'willfully' when applied to the intent with which an act is done or omitted means with a purpose or willingness to commit the act or to make the omission in question. The word 'willfully' does not require any intent to violate the law, or to injure another, or to acquire any advantage."

During deliberations, the jury requested that Julio's testimony be read back. After Julio's testimony was read back, the jury submitted the following request for a clarification of the instructions: "We need to clarify what constitutes 'willful intent' in reference to both counts [sic]." At a hearing regarding that inquiry, the trial court reinstructed the jury with CALJIC Nos. 3.30 and 1.20. The following colloquy then occurred: "[THE COURT:] You are shaking your heads. Anybody continue to be troubled? [¶] JUROR NO. 11: All of us. [¶] JUROR NO. 7: We are troubled, some of us. [¶] THE COURT: With the definition? [¶] JUROR NO. 7: It applies to whether or not willful, how it relates to in the event it was accidental. Willfully versus accidentally and how— [¶] THE COURT: Please understand something, even though you may not be lawyers or even though some of these instructions have legal phrases such as willfully as a specific definition, does not mean every single word needs a legal definition. You can use your common sense. [¶] The only

thing I can say is just you have got the basic instructions regarding willful, regarding general criminal intent. That is as far as I can go."

After further deliberations, the jury announced it was deadlocked. At a hearing regarding the foreperson's note that the jury was deadlocked, the following colloquy occurred: "JUROR No. 9: . . . I don't know if the instructions are being followed to the extent they are supposed to be followed. It just seems that there [are] certain things that . . . have more weight than other things . . . . [¶] THE COURT: They are all of equal importance and it's your duty to accept and follow the law. [¶] JUROR No. 9: But it seems like opinions may be getting in the way. . . . [¶] THE COURT: You have to follow the law. If you don't, you are engaging in jury misconduct." After the court inquired whether further instructions or readback might help, Juror No. 12 stated: "I think there is still maybe some discussion about differences in the counts, count 1 and count 2 [*sic*], and what we talked about before, willful intent . . . ." Juror No. 12 indicated that, when Juror No. 12 referred to "count 2," the juror meant the lesser included offense of simple battery. The court directed the jury's attention to CALJIC No. 17.12 (6th ed. 1996 bound vol.) regarding evaluation of evidence pertaining to a greater offense and lesser included offense, but did not further instruct the jury regarding the element in both offenses that the defendant's act be willful. As we have previously mentioned, the court did not instruct the jury regarding the defense of accident.

## DISCUSSION

### I. *Failure to Instruct Regarding Accident*

Penal Code section 26 provides in pertinent part: "All persons are capable of committing crimes except those belonging to the following classes: [¶] . . . [¶] Five—Persons who committed the act or made the omission charged through misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence."

█ The trial court has a duty to instruct sua sponte regarding a defense " 'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense *and* the defense is not inconsistent with the defendant's theory of the case.' [Citation.] [W]hen the trial court believes 'there is substantial evidence that would support a *defense* inconsistent with that advanced by a defendant, the court should ascertain from the defendant whether he wishes instructions on the alternative theory.' [Citation.]" (*People* v. *Breverman* (1998) 19 Cal.4th 142, 157 [77 Cal.Rptr.2d 870, 960 P.2d 1094], italics added by the *Breverman* court.)

When a defense is one that negates proof of an element of the charged offense, the defendant need only raise a reasonable doubt of the existence of that fact. (*People* v. *Tewksbury* (1976) 15 Cal.3d 953, 963 [127 Cal.Rptr. 135, 544 P.2d 1335].) This is so because the defense goes directly to guilt or innocence. The trial court is required to instruct the jury on which party has the burden of proof and on the nature of that burden. (Evid. Code, § 502; *People* v. *Simon* (1995) 9 Cal.4th 493, 501 [37 Cal.Rptr.2d 278, 886 P.2d 1271].) ■ The accident defense is a claim that the defendant acted without forming the mental state necessary to make his actions a crime. (*People* v. *Lara* (1996) 44 Cal.App.4th 102, 110 [51 Cal.Rptr.2d 402].)

■ The testimony of the defense witnesses and Michaela's testimony that at the preliminary hearing she had testified that her injuries were caused accidentally when she was struck by the door as appellant entered the bathroom constituted substantial evidence that her injuries were caused by an accident and that appellant did not have the requisite intent to be guilty of willful infliction of corporal injury on a cohabitant or simple battery. (See *People* v. *Jones* (1991) 234 Cal.App.3d 1303, 1314 [286 Cal.Rptr. 163].) Since there was substantial evidence that Michaela's injuries were caused by an accident and defense counsel relied on the defense of accident in his argument to the jury, the trial court erred in failing to instruct the jury sua sponte regarding that defense when initially instructing the jury. (See *ibid.*; *People* v. *Breverman*, *supra*, 19 Cal.4th at p. 157; *People* v. *Elize* (1999) 71 Cal.App.4th 605, 611-616 [84 Cal.Rptr.2d 35].)

Moreover, the trial court compounded the error and bypassed an opportunity to cure it when it responded to the jury's inquiry seeking a clarification of the instructions. It is apparent that all of the jurors were experiencing difficulty with the court's instructions concerning the willful intent required in order to convict appellant in light of the evidence that Michaela M. was injured in an accident. Penal Code section 1138 provides in pertinent part: "After the jury have retired for deliberation, . . . if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given . . . ." Here, the trial court did not offer the jury any assistance, but reread several instructions already given, told the jury to use its common sense, and concluded by stating: "That is as far as I can go." This omission, separate and apart from the initial failure to instruct sua sponte on the defense of accident, is error. (See *People* v. *Beardslee* (1991) 53 Cal.3d 68, 96-97 [279 Cal.Rptr. 276, 806 P.2d 1311]; *People* v. *Miller* (1981) 120 Cal.App.3d 233, 236 [174 Cal.Rptr. 479].)

In *People* v. *Beardslee*, *supra*, 53 Cal.3d at page 97, the Supreme Court criticized the trial court for "figuratively throw[ing] up its hands and tell[ing]

the jury it [could not] help." The court explained: "The trial court was understandably reluctant to strike out on its own. But a court must do more than figuratively throw up its hands and tell the jury it cannot help. It must at least *consider* how it can best aid the jury. It should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given." (*Ibid.*, original italics.) In that case, the trial court had stated to counsel: " 'A message was given to the Court by the jury asking for explanation of the jury instructions which, of course, is typical whenever you send instructions into the jury room. [¶] You are advised that the court is not going to explain any instructions. They either get it figured out for themselves or not. [¶] Every time a judge opens his big mouth and tries to explain what an instruction means, he puts his foot in it and the Appellate Court promptly bites if off. [¶] There will be no explanation of any of those jury instructions that went into that jury room, just so you know. That's what is going to be told to them.' " (*Id.* at p. 96.)

Unfortunately, the trial court's failure in the present case to aid the jury during its deliberations by providing adequate instruction in response to its inquiry is a failure we perceive is all too common. Rereading previously given standard CALJIC instructions in response to a jury's question on the law when those instructions are inadequate rather than responding directly to the jury's question out of fear of committing error is not a rarity. The trial court left the jury in this case floundering.

We need not determine whether the applicable standard of prejudice is whether the error in failing to instruct regarding the defense of accident was harmless beyond a reasonable doubt or the less stringent standard articulated in *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. In view of the jury's request that Julio M.'s testimony be read back, the jury's assertion that it was confused regarding how an accident would affect whether appellant's conduct was willful, and the jury's indication that it was deadlocked regarding whether appellant acted willfully, it is reasonably probable that appellant would have obtained a more favorable result if the jury had been instructed regarding the defense of accident and the nature of the burden of proof on that issue. (See *People* v. *Simon, supra*, 9 Cal.4th at p. 502; *People* v. *Elize, supra*, 71 Cal.App.4th at p. 616.) The judgment must therefore be reversed.

II. *Failure to Impose a Restitution Fine Pursuant to Penal Code Section 1202.45*

Penal Code section 1202.45 provides: "In every case where a person is convicted of a crime and whose sentence includes a period of parole, the

court shall at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4. This additional restitution fine shall be suspended unless the person's parole is revoked." Appellant's sentence included a period of parole. (Pen. Code, § 3000.) On remand, if appellant is again convicted of and sentenced for willful infliction of corporal injury on a cohabitant, the court must impose a restitution fine under Penal Code section 1202.45 in the same amount as any restitution fine it imposes under Penal Code section 1202.4, subdivision (b). That additional fine must be suspended unless and until appellant's parole is revoked. (*People* v. *Barrera* (1999) 70 Cal.App.4th 541, 556 [82 Cal.Rptr.2d 755]; *People* v. *Hong* (1998) 64 Cal.App.4th 1071, 1084 [76 Cal.Rptr.2d 23].)

## DISPOSITION

The judgment is reversed.

Boren, P. J., and Nott, J., concurred.

On August 26, 1999, the opinion was modified to read as printed above.