Filed 7/19/21  P. v. Pitoau CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>RAY KOLOSETA PITOAU,<br><br>        Defendant and Appellant. | D076978<br><br><br>(Super. Ct. No. SCD273138) |


APPEAL from a judgment of the Superior Court of San Diego County, Melinda J. Lasater, Judge.  Affirmed.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

During a verbal altercation in San Diego's Gaslamp Quarter, defendant Ray Pitoau pulled a gun, which eventually discharged after one of the participants in the altercation attempted to disarm Pitoau. The participant and an uninvolved bystander were shot. Pitoau argued at trial that he had acted in self-defense, and that the gun accidentally discharged during the altercation. Across several trials, juries ultimately found Pitoau guilty of assault with a firearm (Pen. Code, § 245, subd. (a)(2)),[1] simple assault (§ 240), carrying a loaded firearm in public (§ 25850), being a felon in possession of a firearm (§ 29800, subd. (a)(1)), and carrying a concealed firearm (§ 25400, subd. (a)(2)). A jury also found firearm (§§ 12022.5, subd. (a), 1192.7, subd. (c)(8)) and great bodily injury (§§ 12022.7, subd. (a), 1192.7, subd. (c)(8)) enhancement allegations to be true, and Pitoau admitted certain priors. The trial court sentenced him to 21 years, plus 50 years to life.

On appeal, Pitoau contends the trial court erred by refusing to instruct the jury regarding his accident defense. We need not determine whether the trial court erred in refusing the instruction, because any such error was harmless. The court properly instructed jurors that to find Pitoau guilty of assault, they would have to find that he "willfully"—defined as "willingly or *on purpose*" (CALCRIM Nos. 875, 915, italics added)—committed the assaults, and that to find the firearm enhancement allegations true, they would have to find that he acted "intentionally" (CALCRIM No. 3146). By finding Pitoau guilty and the enhancement allegations true, the jury necessarily rejected his accident theory.

Accordingly, we affirm the judgment.

---

[1] Unspecified statutory references are to the Penal Code.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Assaults

On August 6, 2017, brothers Jason, Joshua, and Stephen attended a concert at Petco Park. They drank alcohol before, during, and likely after the concert.

After the concert, around midnight, the brothers met up with some of Jason's friends in the nearby Gaslamp Quarter. Jason and the friends were all off-duty law enforcement officers. The group went to two bars. Bouncers escorted Joshua and Jason out of the first bar after Joshua got into an argument with other patrons. The group decided to call it a night a little after 1:00 a.m.

As the group walked down the sidewalk, Joshua passed Pitoau, who was sitting on a handrail outside a restaurant. The jury heard conflicting testimony about what happened next.

According to prosecution witnesses, Pitoau started a verbal altercation, hopped off the handrail, raised his shirt to reveal a handgun tucked in his waistband, and approached Joshua. When Joshua said he did not want any trouble, Pitoau "drew his weapon and pointed it at [Joshua]." Joshua yelled out that someone had a gun, and Jason intervened to attempt to disarm Pitoau. Jason was unsuccessful, and Pitoau fired two shots, striking Jason and an uninvolved bystander, both of whom were treated for their wounds at hospitals.

According to Pitoau, it was Joshua who started the verbal altercation as he walked by. Pitoau was willing to fist-fight Joshua one-on-one, but Joshua left and quickly returned with his group of friends. The group mocked Pitoau and "started fanning out" around him. Pitoau believed the group was going to "jump" him and possibly kill him. Pitoau backed up and

bumped into his friend (Emery Z.), who had been waiting with Pitoau outside the restaurant. When he bumped into Emery, Pitoau felt Emery holding something that turned out to be a gun. Pitoau grabbed the gun, pointed it toward the ground—never at the group—and repeatedly told the group to "[b]ack the fuck up." Jason approached Pitoau, grabbed at his hand in an attempt to disarm him, and the men struggled over the gun. During the struggle, the gun discharged twice.

Pitoau ran off through downtown, ducking into a parking garage to change his shirt and hairstyle. In a secluded area, he abandoned the gun by placing it under the tire of a parked semi truck so that the gun would get driven over and become unusable. Pitoau messaged a friend through social media, stating, "I shot someone. They all over me downtown." Pitoau hitchhiked home, then fled the next day to Mexico.

Police found the gun and linked it to Pitoau through DNA. DNA analysis excluded Pitoau's friend, Emery, as a possible contributor, and further excluded Jason as a contributor from one area of the gun, but indicated limited support for inclusion as to another area of the gun.

About one month after the incident, Pitoau was apprehended in Mexico and brought back to the United States.

### Verdicts and Sentencing

Pitoau was charged with three counts of assault with a firearm (§ 245, subd. (a)(2)), and one count each of carrying a loaded firearm in public (§ 25850, subd. (a)), being a felon in possession of a firearm (§ 29800, subd. (a)(1)), and carrying a concealed firearm (§ 25400, subd. (a)(2)). The assault charges carried enhancement allegations that Pitoau personally used a firearm (§§ 12022.5, subd. (a), 1192.7, subd. (c)(8)) and, as to the victims who

4

were shot, personally inflicted great bodily injury (§§ 12022.7, subd. (a), 1192.7, subd. (c)(8)) in the commission of the offense.

Pitoau was tried three times before he was eventually convicted on all charges.

In the first trial, the jury found Pitoau guilty on the three firearm-related counts, but could not reach unanimous verdicts on the assault counts.

In a retrial on the assault counts, the jury was likewise unable to reach unanimous verdicts.

In yet another retrial on the assault counts, the jury found Pitoau guilty of assault with a firearm as to Jason and the bystander, and guilty of simple assault (as a lesser included offense of assault with a firearm) as to Joshua. The jury found true the firearm and great bodily injury enhancement allegations attached to the assault with a firearm counts.

Pitoau admitted four prison priors, two serious felony priors, and two strike priors.

The trial court sentenced Pitoau to 21 years, plus 50 years to life.

## DISCUSSION

Pitoau contends substantial evidence supported his theory that the gun discharged accidentally while Jason was attempting to wrestle it away from him, and, thus, the trial court erred by denying Pitoau's request to instruct the jury regarding the defense of accident (CALCRIM No. 3404). We need not determine whether substantial evidence supported the theory, because we conclude the omission of an instruction regarding accident was not prejudicial.

5

## A. **Background**

Jason and Pitoau gave conflicting accounts of how the gun discharged.

According to Jason, he started running toward Pitoau "simultaneously" with Pitoau raising the gun and pointing it chest-high at Jason and Joshua. Jason approached Pitoau, "struck the outside of his forearm, pushing it down, away from [Jason's] body," and "wrapped [his] arms around [Pitoau's] body in a bear hug, and . . . attempted to sweep him to the ground." Jason testified at trial that he never touched the gun itself, but he acknowledged he previously told a police officer he had "grabbed the gun." Jason explained he did not mean "grabbed" in its literal sense. Pitoau managed to free his right arm from the "bear hug," point the gun at Jason, and fire two shots.

According to Pitoau, while he was pointing the gun toward the ground, Jason approached him, reached out, and grabbed the hand in which Pitoau was holding the gun. Jason "cupped" Pitoau's hand with both hands, pulled back, and twisted. Jason "grabbed [the gun], twisted, yanked it, and then he yanked it a couple of times, and then it went off." After the gun discharged, Jason "continued to jerk it," and "it went off again."

Pitoau testified he held the gun with his finger outside the trigger guard the entire time—his "finger was never on the trigger." When the gun discharged, he could not "see the trigger," "see what pushed the trigger back," or "feel what pushed the trigger back." He never "purposely ma[d]e a motion to pull [his] finger in th[e] trigger well." He surmised it "[c]ould have been" "Jason's finger that pushed th[e] trigger."

A criminalist with the police department's firearms unit testified that the recovered gun—a .38 caliber Smith & Wesson revolver—was inoperable when police recovered it. Photographs showed two expended rounds in the cylinder, in a position suggesting the trigger had been pulled six times. An

6

identical gun in the crime lab's "reference collection" had a "trigger pull" of about 12 pounds, which, despite being "one of the heavier trigger pulls you will find," can still be pulled with one finger. The criminalist acknowledged "it's possible that if people are pulling back and forth on a firearm, that a trigger could be pushed back inadvertently." On the other hand, if a person were squeezing the revolver's cylinder, it would increase the amount of force required to pull the trigger, and potentially prevent the revolver from firing altogether.

Based on this testimony, defense counsel requested that the court instruct the jury regarding accident with CALCRIM No. 3404, which provides in part:

> "The defendant is not guilty of <insert crime[s]> if (he/she) acted [or failed to act] without the intent required for that crime, but acted instead accidentally. You may not find the defendant guilty of <insert crime[s]> unless you are convinced beyond a reasonable doubt that (he/she) acted with the required intent."

The prosecutor opposed the request, arguing (1) "[t]here was nothing accidental about" Pitoau "injecting the firearm into the situation"; (2) Pitoau committed an assault with a firearm merely by pointing the gun at people; and (3) Pitoau "never said it was an accident," but, rather, merely said "*he* did not pull the trigger" (italics added).

The court tentatively denied the request, agreeing that the assault appeared to consist of "pulling the gun up and pointing it." The court stated it would conduct further research and deliver a final ruling.

The next court day, the court confirmed its tentative ruling. The court explained that the accident defense is a pinpoint instruction that is "basically a defense that the defendant acted without forming the required mental state to make the act a crime." The court reasoned that because assault with a

7

firearm does not require that the defendant intend to pull the trigger, the instruction was unnecessary. The court noted the defense might be relevant to the firearm enhancement allegations, but concluded that tailoring the instruction for such "an extremely limited application" would be "unduly confusing" to the jury "and extremely difficult" to do.

The court instructed the jury regarding assault with a firearm, using CALCRIM No. 875, which states in part (as given):

> "To prove that the defendant is guilty of [assault with a firearm], the People must prove that:
>
> "1. The defendant did an act with a firearm that by its nature would directly and probably result in the application of force to a person;
>
> "2. The defendant did that act willfully;
>
> "3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone;
>
> "4. When the defendant acted, he had the present ability to apply force with a firearm to a person; [¶] AND
>
> "5. The defendant did not act in self-defense.
>
> "Someone commits an act *willfully* when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else, or gain any advantage."

The court instructed the jury regarding simple assault (as a lesser included offense of assault with a firearm) using CALCRIM No. 915, which is substantially similar to CALCRIM No. 875 and includes the same definition of "willfully."

Finally, regarding the firearm enhancement allegations, the court instructed the jury with CALCRIM No. 3146, which states in part: "Someone

8

*personally* uses a firearm if he or she *intentionally* does any of the following: [¶] 1. Displays the firearm in a menacing manner; [¶] 2. Hits someone with the firearm; [¶] OR [¶] 3. Fires the firearm." (Second italics added.)

In closing, the prosecutor argued Pitoau had acted "willfully" because "whatever act" he did—"raising a gun, squeezing the trigger, interjecting it in the situation"—"was an intentional one. . . . It wasn't a result of a spasm or something like that." The prosecutor further argued the "defense position" was "refute[d]" by the fact the expended rounds "were in such a position [in the cylinder that] it looks like the trigger got pulled six times. That's not six inadvertent gunshots; that's 'I'm shooting someone and I'm emptying the clip.' I'm squeezing that trigger as many times as I can."

Defense counsel argued in closing that "there's no evidence that th[e] trigger was pulled willfully"—"there was a tug of war," Pitoau's "finger was not on the trigger," Pitoau "doesn't remember feeling his finger ever hit the trigger," and "they couldn't see . . . where the trigger [was] at that point." Counsel implored the jury, "[Y]ou have to ask yourself, was it done willfully? Was that a volitional act? And if no one can see the trigger, no one can answer that question. And there's the reasonable doubt."

As noted, the jury found Pitoau guilty of two counts of assault with a firearm and one count of simple assault, and found the firearm enhancement allegations attached to the assault with a firearm counts to be true.

### B. **Legal Principles**

The defense of accident is available to any person "who committed the act . . . charged through misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence." (§ 26; see *People v. Anderson* (2011) 51 Cal.4th 989, 996 (*Anderson*).)

9

Accident is not a true affirmative defense. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 199, fn. 3.) Rather, "it is a request for an instruction that negates the intent element of" a charged offense. (*Ibid*.; see *People v. Jennings* (2010) 50 Cal.4th 616, 674 (*Jennings*) [the claim of "accident 'amounts to a claim that the defendant acted without forming the mental state necessary to make his or her actions a crime' "]; CALCRIM No. 3404 ["The defendant is not guilty . . . if (he/she) acted . . . without the intent required for that crime, but acted instead accidentally."].)

Because the accident defense seeks only to "rebut the mental element of the crime or crimes with which the defendant was charged" (*Anderson, supra,* 51 Cal.4th at p. 998), it is a pinpoint instruction that need only be given upon request (*id.* at pp. 996-997; see *Jennings, supra,* 50 Cal.4th at pp. 674-675). "A trial court must give a pinpoint instruction, even when requested, only if it is supported by substantial evidence." (*People v. Ward* (2005) 36 Cal.4th 186, 214.) " 'In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether "there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt." [Citations.]' " (*People v. Mentch* (2008) 45 Cal.4th 274, 288; see *People v. Wilson* (2005) 36 Cal.4th 309, 331 [" 'Substantial evidence is "evidence sufficient 'to deserve consideration by the jury,' not 'whenever *any* evidence is presented, no matter how weak.' " ' "].)

"Omission of an instruction is harmless beyond a reasonable doubt if ' "the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions." ' " (*People v. Lujano* (2017) 15 Cal.App.5th 187, 195-196, quoting *People v. Wright* (2006) 40 Cal.4th 81, 98.)

## C. **Analysis**

We need not decide whether substantial evidence supported Pitoau's accident theory—and, thus, whether the trial court erred by refusing to instruct on that theory—because we conclude the omission of the instruction was harmless beyond a reasonable doubt.

We find *People v. Jones* (1991) 234 Cal.App.3d 1303 (*Jones*) highly instructive. The defendant in *Jones* was convicted of attempted premeditated murder after he suddenly opened his car door during a traffic stop and pointed a shotgun at a deputy sheriff's head. (*Id.* at pp. 1306, 1308.) When the deputy "made a sweeping motion with his left hand to try to knock the shotgun barrel away . . . , the shotgun went off, striking [the deputy]." (*Ibid.*) When the defendant was apprehended, he told the arresting officer, "I didn't mean to shoot him." (*Id.* at pp. 1308-1309.)

On appeal, the defendant argued "the trial court committed prejudicial error by failing to instruct the jury sua sponte on the defense of 'accident and misfortune.'" (*Jones*, *supra*, 234 Cal.App.3d at p. 1313.) The Court of Appeal agreed there was error because "a reasonable juror could have concluded" "that the shotgun discharged by accident, as a result of being struck by [the deputy]." (*Id.* at p. 1314.)[2] But the court found the error "was harmless beyond a reasonable doubt" (*id.* at p. 1316) because "*other* proper instructions adequately guide[d] the jury in reaching factual determinations on those issues which would have been presented to the jury by the omitted instruction" (*id.* at p. 1314). Specifically, the trial court instructed the jury that to find the attempted murder was premeditated, the jury would have to

---

2    The California Supreme Court disapproved of *Jones* to the extent it held that courts have a sua sponte duty to instruct on accident. (*Anderson, supra*, 51 Cal.4th at p. 998, fn. 3.)

11

find it was "willful, deliberate and premediated." (*Id.* at p. 1315.) " 'Willful' was properly defined for the jury as meaning 'intentional.' " (*Ibid.*) The appellate court reasoned that by finding that the defendant had acted willfully, "it [was] clear, beyond credible argument, that the jury necessarily rejected the evidence . . . that would have supported a finding to the effect that defendant's 'accident and misfortune' defense . . . was valid, thus implicitly resolving the question of that defense adversely to defendant." (*Id.* at pp. 1315-1316.)

Likewise, if there was any error here, it was harmless beyond a reasonable doubt. The trial court instructed the jury that to find Pitoau guilty of assault with a firearm or simple assault, the jury had to find beyond a reasonable doubt that Pitoau "willfully" did an act "that by its nature would directly and probably result in the application of force to a person." The court properly defined "willfully" as meaning "willingly or on purpose." (CALCRIM Nos. 875, 915.) The court also instructed the jury that to find the firearm enhancement allegations true, the jury had to find beyond a reasonable doubt that Pitoau "intentionally" did a specified act with a firearm. (CALCRIM No. 3146.) Counsels' closing arguments squarely addressed these concepts. By finding Pitoau guilty and the enhancement allegations to be true, the jury necessarily found that he acted "willfully," "willingly," "on purpose," and "intentionally"—that is, he did not act accidentally. Thus, the failure to instruct on accident was harmless beyond a reasonable doubt.

**DISPOSITION**

The judgment is affirmed.

HALLER, J.

WE CONCUR:


HUFFMAN, Acting P. J.


DATO, J.