Filed 11/15/13  P. v. Thipthammavong CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>RICKY LAMMONE<br>THIPTHAMMAVONG,<br><br>        Defendant and Appellant. | E055864<br><br>(Super.Ct.No. SWF1100151)<br><br>**OPINION** |

APPEAL from the Superior Court of Riverside County.  Mark Mandio, Judge.

Affirmed in part; reversed in part with directions.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant

and Appellant.

        Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant

Attorney General, Julie L. Garland, Senior Assistant Attorney General, William M.

1

Wood, Gary W. Brozio and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Ricky Lammone Thipthammavong began inappropriately touching Jane Doe 1, his biological daughter, when she was five years old. Defendant had sexual intercourse with Doe 1 numerous times. Defendant stopped molesting Doe 1 when she was 11 years old. Defendant also had sexual intercourse with Jane Doe 2, who is also his biological daughter, starting when she was five years old, and ending when she was almost eight years old.

Defendant was convicted of seven counts of aggravated sexual assault on a child (rape and sexual penetration by force) and one count of committing a lewd act upon a child.

Defendant claims on appeal as follows:

1. The jury should have been instructed that a reasonable, good faith belief in consent is a defense to the aggravated sexual assault counts, and the failure to allow such a defense violated his federal constitutional rights to due process and a fair trial.

2. Child Sexual Abuse Accommodation Syndrome (CSAAS) evidence should be inadmissible for all purposes, and its admission in this case was prejudicial.

3. CALCRIM No. 1193 erroneously advised the jury that it may consider the CSAAS expert testimony in determining the complaining witnesses' credibility.

4. CALCRIM No. 330 improperly bolstered Doe 2's credibility in violation of his state and federal constitutional rights to a jury trial, confrontation, due process of law, and the right to present a defense.

2

5. His sentence of 15 years to life for his lewd conduct conviction is erroneous because he was not convicted of offenses listed in Penal Code section 667.61, subdivision (c),[1] the one strike law against more than one victim.

6. The $240 restitution fine violates ex post facto principles, and the fine must be reduced to $200 according to the law applicable when the offenses were committed.

I

PROCEDURAL BACKGROUND

A jury found defendant guilty of five counts of aggravated sexual assault (rape) of Doe 1 pursuant to section 269, subdivision (a)(1) (counts 1, 4-7). The jury also found true the special allegations for counts 5 through 7 that he committed the offenses against more than one victim within the meaning of section 667.61, subdivision (e)(5). The jury additionally found defendant guilty of committing a lewd and lascivious act against Doe 2 (§ 288, subd. (a)) (count 8). They also found him guilty of two counts of aggravated sexual assault (rape and sexual penetration) of Doe 2 (§ 269, subds. (a)(1), (5)) (counts 9, 11). For the counts against Doe 2, the jury found true the special allegations for counts 8 and 9 that he committed the crimes against more than one victim (§ 667.61, subd. (e)(5)).[2]

---

[1] All future statutory references are to the Penal Code unless otherwise indicated.

[2] The jury was hung on two additional charges of rape of Doe 1, and those charges were dismissed in the interests of justice. They also found defendant not guilty of a charge of forcible sodomy on Doe 2.

Defendant was sentenced to consecutive 15-years-to-life sentences on all counts (including the lewd conduct conviction in count 8) for a total state prison sentence of 120 years to life. He was ordered to pay a $240 restitution fine pursuant to section 1202.4.

## II

## FACTUAL BACKGROUND

A. *People's Case-in-Chief*

1. *Sexual acts against Doe 1*

Doe 1 was 13 years old at the time of trial. Her mother was M. K. and Doe 2 was her nine-year-old sister. Defendant was her biological father. When Doe 1 was in the third grade, defendant and M.K. ended their romantic relationship. Does 1 and 2 stayed with M.K. during the week and had visitation with defendant on the weekends.

When Doe 1 was in the third or fourth grade, she visited defendant in an apartment where Doe 1's aunt lived. Doe 1 and defendant were lying on the floor in the living room. Doe 1 believed that Doe 2 was in the shower. No other adults were home. Doe 1 was wearing a shirt but no pants. Defendant got on top of her. He put his penis in her vagina. She described it as feeling "awkward," and it "hurt."

On another occasion, when Doe 1 was in the third or fourth grade, defendant had taken Does 1 and 2 to a party. After leaving the party, defendant drove Doe 1 and Doe 2 to their home. When they arrived home, Doe 2 went to take a shower. Defendant again put his penis inside Doe 1's vagina that night. Doe 1 never told defendant that the sexual intercourse hurt her.

4

Another time, when Doe 1 was 10 or 11 years old, defendant was living with Doe's aunt in Perris or Menifee. Defendant had his own bedroom. Defendant and Doe 1 had sex in the bedroom. Defendant had some type of camera. Doe 1 had no clothes on below her waist. Defendant took a picture of her from the waist down while her clothes were off. He put a pillow over her face while he took a picture.

On another occasion, while they were living in Temecula, Doe 1 exited the shower while she and Doe 2 were staying with defendant. Doe 2 went into the shower when Doe 1 came out. Doe 1 went into defendant's bedroom to get clothes, as she was only wearing a towel. Defendant was lying on the bed wearing only boxer shorts. He told her to sit on his lap. Defendant took his penis out of the hole in his boxers and put it in her vagina. Initially at trial, Doe 1 could not recall the first time she had sex with defendant, but she believed he started molesting her when she was nine or ten years old. She later testified that the first time she and defendant had sex, she was four to six years old. M.K. was in the room on her computer but had her back to them. Doe 1 claimed it was very "quick."

Defendant stopped having sex with Doe 1 when she was between 10 and 11 years old but gave no reason for stopping. Doe 1 could not recall all the times that defendant had sex with her. Initially, each time defendant would have sex with Doe 1, she would "kind of squirm" her body and try to get away from him. After some time, Doe 1 quit trying to squirm away from defendant because it would not work. She knew she could not get away. She continued to be "scared" throughout the time these incidents were happening. Defendant never threatened Doe 1, but he did tell her not to tell anyone.

5

When she was 12 yrs. old, Doe 1 finally told M.K. what had happened. M.K. caught her sending sexually explicit text messages to a boy. M.K. told Doe 1 that she was going to have to take a virginity test. Doe 1 thought that such a test was real and was scared. She told her mother what defendant had done to her because she did not want her mother to think she had had sex with her boyfriend. She told M.K. that defendant was "full-on raping" her since she was five years old.

Doe 1 claimed she never talked to Doe 2 about any of these things. They were not close. Doe 1 did not tell her mother, in the presence of Doe 2, what defendant was doing to her. Doe 1 had not had sex with anyone else. In sixth and seventh grade, Doe 1 started cutting herself. M.K. called the police.

### 2. *Doe 2's testimony*

At the time of trial, Doe 2 was nine years old and in the fourth grade. At trial, she claimed defendant began inappropriately touching her when she was seven years old. On one occasion, Doe 2 was wearing a shirt and defendant took her pants and underwear off. Defendant took his clothes off. He then touched her with the part of his body that "pee" comes out (his penis) on her body where "pee" comes out (her vagina). He put his penis inside of her.

When defendant was inside her, it hurt a "little." Defendant did this almost every time that she and Doe 1 had stayed with him for visitation. This stopped, at eight years old, when she no longer had to stay with him. Doe 2 did not recall anything coming out of his penis when this happened. She could not recall any touching that occurred where her "poop" came out of her bottom.

6

Doe 2 thought that defendant might have touched her vagina with his fingers. She had a hard time talking about what happened to her. She never told defendant to stop but she knew that what he was doing was wrong.

The jury heard a pretrial interview of Doe 2.[3] Doe 2 told the interviewer that defendant touched her in the "wrong place." She described it as her private place where she went to the restroom. Doe 2 told the interviewer that defendant touched her when she was five years old. She only remembered this because Doe 1 told her.

Doe 2's preliminary hearing testimony was read to the jury. Doe 2 indicated that the first time defendant touched her was while defendant was living with her aunt, when she was five years old. Doe 2, defendant, and Doe 1 were in his bed. Doe 1 was sleeping. Defendant put his penis in her vagina. It "sort of" hurt her. Defendant never said anything to her, and she never told him to stop. She knew what he was doing was "wrong." She did not tell anyone because she was "afraid." He continued to do this until she was eight years old. Doe 2 also had testified at the preliminary hearing that he sodomized her several times when she was seven years old. He also put his fingers in her vagina. Yellow liquid came out of his penis when they had sex.

---

[3] Defendant agreed not to cross-examine Doe 2, and the parties stipulated that her entire pretrial interview would be played for the jury and that the preliminary hearing testimony would be read to the jury. Doe 2 had come to court that morning and did not want to testify.

### 3. *Investigation*

On January 28, 2011, County Sheriff's Detective Fred Collazo set up a pretext telephone call between defendant and Doe 1. Doe 1 told defendant that she had received good grades. She then told him that they were studying how babies were made in science class. She asked defendant why she never had a baby when they had sex together. At first, defendant responded that he did not know what she was talking about. He then told her he would talk to her in person. Doe 1 told him it was too awkward to talk to him in person. Doe 1 again asked him why she did not get pregnant, and he responded that they didn't do anything. She told him that she was having flashbacks about having sex with him.

Defendant then told her she was too young to get pregnant. He then confirmed that she had now started menstruating. Doe 1 asked him if that is why he stopped having sex with her, and he again said he would talk to her about it in person. Doe 1 then asked him if he was sorry "this has happened?" Defendant responded that he was sorry. She asked him if he would do it again and he promised he would not. She then asked if he ever did it to Doe 2, and he responded, "No, no, no, no, no, no."

After the call, defendant was arrested and interviewed. Defendant admitted he had rubbed his penis against Doe 1's vagina but claimed it was only once. He never put his penis in her vagina and did not ejaculate. He claimed they were wearing clothes, and he was just "dry humping" her. He later said they were naked but he denied he ever penetrated her vagina. He denied ever having sex with Doe 2.

Defendant wrote an apology letter to Doe 1. In it, he asked her to forgive him for what he had done to her. He told her that he loved her and would never do anything to her again. He said he was sorry, and he loved her. He also told Doe 1 to tell Doe 2 that he loved her.

Does 1 and 2 were given sexual assault examinations on February 1, 2011, by a forensic pediatrician. Doe 1 had evidence of cutting on her arms. There were no findings of abuse or injury in her genital and anal regions. The pediatrician opined that it was common for no injury to appear, especially if some time had passed since the last abuse. Her hymen was intact, but that was not conclusive as to whether there was penile penetration. There was no conclusive test to determine if a person was a virgin. There were no findings of abuse or injury on Doe 2's genital or anal area. The pediatrician again stated that any injury would heal quickly. Doe 2 had no injury to her hymen.

4. *CSAAS*

Dr. Veronica Thomas was a clinical psychologist. Dr. Thomas explained that there were five components of CSAAS. The first component was secrecy, which could be either implicit or explicit actions by the perpetrator to the victim not to tell anyone. A young child could be intimidated by fear or not understand what is happening. The second component was helplessness and depression, which was due to the confusing experience of being sexually assaulted by a trusted person. It could take a child a long time to figure out that the sexual molestation by this trusted person was wrong. The third component was called entrapment and accommodation. This occurred when a child recognized that there was nothing she could do about the abuse and just

9

compartmentalized it in her life. Further, the child might realize that she was dependent upon the abuser for shelter and food. The fourth element was disclosure; the child finally disclosing what was happening to her. It was common for children who were molested to delay disclosing the molestation when it was by a trusted person, as opposed to a stranger. Even young children could feel a responsibility to not upset the family.

The final component of CSAAS was recantation. Once the child discloses the molestation, she will have to answer very personal sexual questions from social services and the police. Further, there are consequences, such as being removed from the home. It would be easier to recant in order to stop the consequences. The victim might try to minimize what had occurred. A child's memory of the event might be inconsistent. A child might repress the memory of what happened, and something may trigger a memory of what happened.

Dr. Thomas had not met anyone involved in the instant case and had not reviewed the records.

B.      *Defense*

Defendant's brother and sister both testified that they had been with defendant throughout the years while he was with Does 1 and 2. Does 1 and 2 did not appear afraid of defendant. They acted like normal, happy children.

One witness, B.B. was friends with M.K. M.K. called B.B. after Doe 1 disclosed the abuse by defendant. B.B. went to M.K.'s house the following day. She talked to Doe 1 and told her to be strong and tell the police officer everything that had happened to her. She also talked to Doe 2. She asked her if anyone had ever touched her private parts, and

10

Doe 2 was confused. B.B. then pointed to her own vagina and breasts. Doe 2 dropped a cup that she had in her hand, said "yes," and then ran out of the room.

Dr. Mitchell Eisen was a psychologist who specialized in suggestibility and memory of victims after tragic events or sexual abuse. Dr. Eisen indicated that there was research that supported a child having a dream about being sexually molested and incorporating it into a genuine memory. Dr. Eisen also indicated that a child could be influenced by family members, especially if another sibling is being abused, to state that abuse has occurred when it had not.

III

DEFENSE OF REASONABLE, GOOD FAITH BELIEF IN CONSENT BY A MINOR

UNDER THE AGE OF 14 TO FORCIBLE SEXUAL ACTS

Defendant contends that the trial court erred by omitting from the jury instructions on aggravated assault — rape and forcible sexual penetration — that a reasonable, good faith belief in consent was a defense to the crimes. Such error violated his federal constitutional rights to a fair trial and due process.

A.      *Additional Factual Background*

During discussion of the instructions, there was no objection by either party to the standard instructions to be given for aggravated sexual assault for rape and sexual penetration by force. These instructions (CALCRIM Nos. 1000, 1045) included that the People had to prove that the acts were accomplished against the will of Does 1 and 2, and that the "female did not consent to the intercourse," and it instructed the jury that "[t]o consent, a female must act freely and voluntarily and know the nature of the act." It did

11

not include language that a defense to the crime was that a defendant could have a reasonable, good faith belief that the victim consented even if there was no actual consent.

During the People's opening argument, the prosecutor argued that Doe 1 did not consent to the rape. When Doe 1 was first being raped, she was only four to six years old and did not understand what was happening to her. She also testified that she would try to squirm away from defendant. As to Doe 2, the prosecutor argued there was no consent because she was too young and did not know what was happening to her. Defendant argued during closing that, "[i]f [defendant]'s reasonably believing that she is not objecting to this, that she is consenting to this, even though that's not the case, that's a complete defense to rape."

Prior to the People's closing argument, the trial court noted that it had not included in the instructions that defendant could have a good faith, reasonable belief that Does 1 and 2 consented because "society will not tolerate, even if it's a actual belief that a child 13 or under consented." The trial court stated that there was no evidence of reasonable belief. Defendant's counsel argued there was sufficient evidence because Does 1 and 2 were not protesting. The trial court ruled that it did not believe that a defendant could reasonably believe that a child under the age of 13 years could consent. However, a child could actually consent, which would be a defense.

The trial court informed the jury that it had inadvertently failed to advise defendant's counsel of the proper instructions on consent. It then instructed the jury as follows: "[R]egarding the law of rape, sodomy, and sexual penetration. [¶] In a case in

12

which the alleged victim is an adult, a defendant is not guilty of rape if he actually and reasonably believed the alleged victim consented to the intercourse, sodomy, or sexual penetration. [¶] However, in a case in which the alleged victim is a minor, that is a person under 18 years of age, it is not a defense to rape, sodomy, and sexual penetration that the defendant reasonably believed the alleged victim consented to the intercourse, sodomy, or sexual penetration. [¶] However, the People still must prove beyond a reasonable doubt that the alleged victim did not actually consent to the intercourse, sodomy or sexual penetration."

B.    *Analysis*

The crime of an aggravated sexual assault on a child by means of rape requires an act of "[r]ape, in violation of paragraph (2) or (6) of subdivision (a) of Section 261." (§ 269, subd. (a)(1).) Subdivision (a)(2) of section 261 requires that the act of rape be "accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." (§ 261, subd. (a)(2).) The crime of aggravated sexual assault of a child by means of sexual penetration also requires that the act be committed against the victim's will and through the use of force, violence, duress, menace, or fear. (§ 289, subd. (a)(1).)

Defendant contends that he was entitled to instruction to the jury that he had a reasonable, good faith belief that Does 1 and 2 consented to the acts. The People contend that the California Supreme Court made it clear in *People v. Soto* (2011) 51 Cal.4th 229, 233, 248 that no child under the age of 14 years of age can consent to any lewd act under any circumstance. However, in *Soto*, the crime committed (forcible lewd act) did not

13

require that it be committed against the will of the victim. (*Id.* at p. 237.) The aggravated rape and sexual penetration here both required that the acts be committed against the will of the victim. For purposes of this case, we need not decide whether a defendant is entitled to instruction on a reasonable, good faith belief in consent for aggravated sexual assault involving a minor. We will assume, without deciding, that the trial court did err by ruling that a reasonable, good faith belief of consent was not a defense. As we will discuss, the error was harmless.

"The trial court has a sua sponte duty to instruct on defenses where there is substantial evidence to support the instruction. [Citation.]" (*People v. Felix* (2001) 92 Cal.App.4th 905, 911.) Under *People v. Mayberry* (1975) 15 Cal.3d 143, a defendant charged with a forcible sex offense is not guilty if he or she had a mistaken but good faith and reasonable belief that the adult victim consented. (*Id*. at pp. 153-158.) "If a defendant entertains a reasonable and bona fide belief that a prosecutrix voluntarily consented . . . to engage in sexual intercourse, it is apparent he does not possess the wrongful intent that is a prerequisite . . . to a conviction of . . . rape by means of force or threat [citation]." (*Id*. at p. 155.)

"[T]he *Mayberry* defense 'has two components, one subjective, and one objective. The subjective component asks whether the defendant honestly and in good faith, albeit mistakenly, believed that the victim consented to sexual intercourse. In order to satisfy this component, a defendant must adduce evidence of the victim's equivocal conduct on the basis of which he erroneously believed there was consent. [¶] In addition, the defendant must satisfy the objective component, which asks whether the defendant's

14

mistake regarding consent was reasonable under the circumstances. Thus, regardless of how strongly a defendant may subjectively believe a person has consented to sexual intercourse, that belief must be formed under circumstances society will tolerate as reasonable in order for the defendant to have adduced substantial evidence giving rise to a *Mayberry* instruction.' [Citation.]" (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1148.)

The test for prejudice from the court's failure to instruct the jury on a defense is not entirely clear. (See, e.g., *People v. Gonzales* (1999) 74 Cal.App.4th 382, 391, ["[w]e need not determine whether the applicable standard of prejudice is whether the error in failing to instruct regarding the defense of accident was harmless beyond a reasonable doubt or the less stringent standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836"]; *People v. Rogers* (2006) 39 Cal.4th 826, 868, fn. 16 [an exception to the *Watson* standard may exist "when the error deprives the defendant of the federal due process right to present a complete defense"]; *People v. Russell* (2006) 144 Cal.App.4th 1415, 1431 ["[e]rror in failing to instruct on the mistake-of-fact defense is subject to" *Watson* test].) In an abundance of caution, we apply the more stringent beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24 especially in light of defendant's argument that his federal constitutional rights were violated.

Here, defendant did not take the stand; thus, he did not testify that he subjectively believed that the victim consented. When he spoke with Detective Collazo, he admitted that he touched his penis to Doe 1's vagina but denied penetration. He claimed it only happened once. He never implicitly or explicitly stated that she consented to the act. In

fact, he apologized for his actions. Defendant completely denied that he ever touched Doe 2. Defendant's counsel argued in closing that the decision the jury had to make was to what extent Doe 1 was molested and whether Doe 2 was molested at all. There simply was no evidence to support an instruction that defendant was claiming he had a reasonable, good faith belief that Does 1 and 2 consented to the sexual assaults. As such, he was not entitled to the *Mayberry* instruction, even if it was applicable.

Additionally, Doe 1 testified that in the beginning she would try to squirm away from defendant in order to get him to stop. She was unable to get away. This was not "equivocal conduct" upon which defendant could base his belief that there was consent. Doe 1's attempts to squirm away from defendant could be interpreted only one way: she did not want to have sex with him.

Moreover, there was no evidence of a mistaken belief in consent that society would tolerate as reasonable under the circumstances. Defendant was the victims' father, giving him an unparalleled level of control over the children, along with their having complete trust in him. Moreover, Doe 2 was between five and seven years old when the abuse occurred. She was completely unaware of what was happening to her. Based on Doe 2's age when these acts were committed, even if the jury was instructed as averred by defendant, it is clear beyond a reasonable doubt that it would have rejected that such a reasonable belief in consent could exist.

Moreover, based on the instructions, the jury had to conclude that defendant used force or duress in committing the acts, which is further evidence that it would reject that

16

defendant believed Does 1 and 2 were consenting to the acts. Finally, the jury necessarily rejected that Does 1 and 2 actually consented.

We are convinced beyond a reasonable doubt that, even if the jury had been given a *Mayberry* instruction, it would have found that defendant did not actually entertain an objectively reasonable belief in consent. As such, any conceivable error was harmless.

IV

CSAAS TESTIMONY

Defendant contends that CSAAS testimony should not be admitted in any trial in California. He further argues that the admission of the evidence was prejudicial in this case.

In California, when a defendant avers that a child's allegation of sexual abuse is inconsistent with her actions, expert testimony on CSAAS has been held admissible to disabuse jurors of commonly held misconceptions about how child sexual abuse victims behave. (See, e.g., *People v. Yovanov* (1999) 69 Cal.App.4th 392, 406-407; *People v. Housley* (1992) 6 Cal.App.4th 947, 954-957.) Defendant relies on cases in other states that limit or exclude CSAAS evidence, and urges this court to follow these other states.

In *People v. Perez* (2010) 182 Cal.App.4th 231, the court rejected a similar challenge to the admissibility of CSAAS evidence, and we find it is well reasoned. It found "no reason to depart from recent precedent, to wit: 'CSAAS cases involve expert testimony regarding the responses of a child molestation victim. Expert testimony on the common reactions of a child molestation victim is not admissible to prove the sex crime charged actually occurred. However, CSAAS testimony "is admissible to rehabilitate

17

[the molestation victim's] credibility when the defendant suggests that the child's conduct after the incident — e.g., a delay in reporting — is inconsistent with his or her testimony claiming molestation. [Citations.]'" [Citations.] Moreover, it appears that our Supreme Court reached the same conclusion in *People v. Brown* (2004) 33 Cal.4th 892, 906, in which case we are bound by its reasoning (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455)." (*Id.* at p. 245.)

The CSAAS evidence was relevant in this case. Does 1 and 2 delayed reporting the molestation by defendant. They never told M.K., despite having to attend weekend visitation with defendant. Additionally, Doe 2 disclosed the abuse at the preliminary hearing, but had failed to do so during a pretrial interview. Further, Doe 2's trial testimony was inconsistent with her previous testimony. It was clear that Doe 2 was terrified to be face-to-face with defendant.

Moreover, the court instructed the jury with the pattern instruction on CSAAS evidence, CALCRIM No. 1193, as follows: "You have heard testimony regarding Child Sexual Abuse Accommodation Syndrome. [¶] Testimony about Child Sexual Abuse Accommodation Syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not (Jane Doe 1)'s or (Jane Doe 2)'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony." The instruction clearly stated that the jury was not to consider the evidence as showing defendant's guilt but that it was only to assess credibility. The evidence is properly admitted for this purpose.

Even if we were to consider that the CSAAS testimony should not have been admitted, such error was harmless. Defendant claims that the testimony of Does 1 and 2 was the only evidence against him, and the CSAAS evidence bolstered their credibility. Defendant discounts his admissions in both the pretext phone call and the police interview that he had touched Doe 1. We find this was strong corroborating evidence supporting the testimony of each of the girls. Further, it is clear that the jury carefully considered the testimony of Does 1 and 2 and did not consider the CSAAS testimony as evidence that defendant committed all of the crimes charged against him. The jury found two of the charged aggravated assaults against Doe 1 not true, and it rejected the forcible sodomy charge alleged as to Doe 2. Accordingly, any error in the admission of the CSAAS evidence in this case did not constitute prejudicial error. (*People v. Watson, supra,* 46 Cal.2d at p. 836; *People v. Bowker* (1988) 203 Cal.App.3d 385, 395[applying *Watson* standard to improper use of CSAAS evidence].) Defendant has not shown a violation of his rights to a fair trial and due process in the admission of the CSAAS evidence, and its admission was not prejudicial.

V

CALCRIM NO. 1193

Closely related to the previous argument, defendant contends the trial court erred by instructing the jury with CALCRIM No. 1193 because it erroneously advised the jurors that they could consider the CSAAS expert's testimony in determining the complaining witnesses' credibility. We disagree.

19

As fully explicated, *ante*, CSAAS evidence is relevant because it can assist the jury in assessing the credibility of the victim's claim of abuse. (*People v. Perez, supra,* 182 Cal.App.4th at p. 245.) If the evidence demonstrates (as it did here) that the child delayed reporting the alleged abuse, CSAAS evidence can be admitted to disabuse the jury of the notion that a child who was really abused would have reported the abuse immediately. Accordingly, the relationship between CSAAS evidence and the victim's credibility that is reflected in CALCRIM No. 1193 is not improper, and the trial court here did not err in giving the instruction.

VI

CALCRIM NO. 330

Defendant further contends that instruction to the jury with CALCRIM No. 330 violated his federal constitutional rights to due process and a jury trial because it unfairly bolstered Doe 2's credibility by telling the jury not to consider her level of cognitive development, and that it could treat her testimony like any adult witness. In addition, it violated his right to present a defense, as it unfairly impaired his ability to impeach Doe 2's credibility.

The jury was instructed with CALCRIM No. 330 as follows: "You have heard testimony from a child who is age 10 or younger. As with any other witness, you must decide whether the child gave truthful and accurate testimony. [¶] In evaluating the child's testimony, you should consider all of the factors surrounding that testimony, including the child's age and level of cognitive development. When you evaluate the child's cognitive development, consider the child's ability to perceive, understand,

20

remember, and communicate.  [¶]  While a child and adult witness may behave differently, that difference does not mean that one is any more or less believable than the other.  You should not discount or distrust the testimony of a witness just because he or she is a child."

Defendant's exact argument was recently rejected in *People v. Fernandez* (2013) 216 Cal.App.4th 540.  In *Fernandez*, the court approved of CALCRIM No. 330, finding it "simply instructs the jury to take into account a child's ability to perceive, understand, remember and communicate when making a credibility determination.  It does not instruct the jury to subject a child's testimony to a less rigorous credibility determination, nor does it excessively inflate a child witness's credibility.  We reject appellant's constitutional challenge to CALCRIM No. 330." (*Fernandez, supra,* 216 Cal.App.4th at p. 559.)  We find *Fernandez* well reasoned and follow it here.  The trial court did not err in instructing the jury with CALCRIM No. 330.

VII

15-YEARS-TO-LIFE SENTENCE UNDER SECTION 667.61, SUBDIVISON (C)

Defendant contends that the trial court erred by sentencing him to a consecutive 15-years-to-life sentence on count 8, his conviction of committing a lewd act upon Doe 2 (§ 288, subdivision (a)).  Defendant was convicted of violating section 288, subdivision (a) against Doe 2 and multiple violations of section 269, subdivision (a)(1) against Doe 1. Thus, the court sentenced defendant using the multiple victim enhancement of section 667.61, subdivisions (b) and (e)(5), apparently on the theory that convictions under section 288 and 269 constituted crimes against more than one victim for purposes of

21

section 667.61, subdivision (c). However, section 269 is not listed in section 667.61, subdivision (c).

Section 667.61 is known as the one strike law. Section 667.61, subdivision (b) provides as follows: "Except as provided in subdivision (a), any person who is convicted of an offense specified in subdivision (c) under one of the circumstances specified in subdivision (e) shall be punished by imprisonment in the state prison for 15 years to life." Subdivision (c) of section 667.61 includes numerous sex crimes, including "[r]ape, in violation of paragraph (2) or (6) of subdivision (a) of Section 261." Subdivision (e)(5) provides for the increased sentence if "[t]he defendant has been convicted in the present case or cases of committing an offense specified in subdivision (c) against more than one victim."[4] Section 288 is expressly enumerated in subdivision (c) of section 667.61, but section 269 is not.

Section 667.61, subdivision (e)(5) requires a *conviction* of an offense that is specified in the statute, and section 269 is not a specified offense. In construing the relevant provisions of section 667.61, "'as with any statute, we strive to ascertain and effectuate the Legislature's intent.' [Citation.] Because statutory language generally provides the most reliable indicator of that intent [citation], we turn to the words themselves, giving them their 'usual and ordinary meanings' and construing them in

---

[4]    Section 667.61 was amended prior to the convictions (but after defendant committed the offenses) in this case, renumbering subdivision (e)(5) as (e)(4). (Stats. 2010, ch. 219.) However, since there was no change in the wording, we need not address the statutory amendment and will refer to section 667.61 as it existed when defendant committed his offenses.

22

context. [Citation.] "'If there is no ambiguity in the language of the statute,' . . . the Legislature is presumed to have meant what it said, and the plain meaning of the statute governs.'"'" [Citation.]" (*People v. Lawrence* (2000) 24 Cal.4th 219, 230-231.) "If the ordinary meaning of the language is 'clear and unambiguous' then we need look no further." (*Preston v. State Bd. of Equalization* (2001) 25 Cal.4th 197, 213.)

We need not look past the clear language of section 667.61 to conclude that section 269 is not an offense listed in subdivision (c). Therefore, conviction of this crime does not trigger the multiple victims' provision of the one strike law.

The People rely on this court's case of *People v. Figueroa* (2008) 162 Cal.App.4th 95 [Fourth District, Div. Two] (*Figueroa*) to support their claim that rape, a violation of section 261, subdivision (a)(2), is necessarily included in a violation of section 269, subdivision (a)(1).

In *Figueroa,* this court agreed with the reasoning in *People v. Jimenez* (2000) 80 Cal.App.4th 286 (*Jimenez*). (*People v. Figueroa, supra,* 162 Cal.App.4th at p. 100.) The court in *Jimenez* held that a conviction for committing the offense of aggravated sexual assault of a child in violation of former section 269 was subject to the mandatory consecutive sentencing provision of section 667.6, subdivision (d) if the predicate crime for the aggravated sexual assault of a child offense is one of the crimes listed in section 667.6, subdivision (d). (*People v. Jimenez, supra,* 80 Cal.App.4th at p. 291.) The court reasoned that because the defendant was convicted of aggravated sexual assault of a child by means of forcible sodomy, and because forcible sodomy is listed in section 667.6, subdivision (d), the mandatory consecutive sentencing provision of section 667.6,

23

subdivision (d) applied.  (*Ibid.*)  The *Jimenez* court rejected the defendant's argument that section 667.6, subdivision (d) did not apply because it did not specifically mention section 269, stating:  "Defendant correctly points out that section 667.6, subdivision (d) does not explicitly provide that it applies to violations of section 269.  However, he makes too much of this omission, ignoring the fact that violation of section 286 is one of the predicate offenses of section 269."  (*Ibid.*)

This same analysis does not apply to the plain language of section 667.61.  Section 667.6, subdivision (d) provides that the section is applicable for every violation of an *offense* listed in subdivision (e) of section 667.6.  Section 667.6, subdivision (d) does not require a conviction of a qualifying offense, while section 667.61, subdivision (e)(5) clearly provides for a conviction.  Therefore, our decision in *Figueroa* (and the decision in *Jimenez*) did not address the requirement in section 667.61, subdivision (e)(5) that a defendant must be *convicted* of a qualifying offense in order to make sentencing under that scheme appropriate.  The Legislature's choice to use the word "convicted" in subdivisions (b) and (e) of section 667.61 cannot simply be read out of the statute.

We are concerned with the inequity of this conclusion, as it provides further punishment for those who commit forcible rape against an adult, but excludes those whose victim is a child under the age of 14.  However, it is for the Legislature to fix this clear drafting error.  As such, we find the trial court erred by imposing an indeterminate sentence of 15 years to life under section 667.61, subdivisions (b) and (e)(5) for the lewd

act conviction in count 8.  We will remand the matter so the trial court can properly sentence defendant for count 8.[5]

## VIII

## RESTITUTION FINE

Defendant contends that the trial court erroneously relied upon the amended version of section 1202.4, effective after his crime was committed, to impose a $240 restitution fine.  Such imposition of the fine violated his federal constitutional right against ex post facto laws.

At sentencing, the trial court noted that the probation report recommended a $10,000 restitution fine pursuant to section 1202.4, and defendant agreed that the current law supported such a fine.  However, the trial court chose to impose a restitution fine under section 1202.4 in the amount of $240.  The only statement regarding the imposition of the fine was as follows:  "I did not impose the fines as requested by [the] probation officer, or recommended or impose maximum fines, because it's my belief that as much money as you can make in prison ought to go to pay restitution."

Previously, section 1202.4 provided as follows:  "The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense, but shall not be less than two hundred dollars ($200). . . ."  (Former § 1202.4, subd. (b)(1),

---

[5] Defendant has not raised that the jury improperly found the section 667.61, subdivision (e)(5) allegations true.  We need not address the issue as mandatory, consecutive sentences of 15 years to life were warranted under section 269, subdivision (e). It is additionally apparent that a mandatory, consecutive sentence on count 8 could be imposed under section 667.6, subdivision (d).  (*People v. Mahara* (2012) 204 Cal.App.4th 641, 650.)

25

Stats. 2011, ch. 45, § 1.) Effective January 1, 2012, the minimum restitution fine was increased to $240. (Stats. 2011, ch. 358, § 1.) "It is well established that the imposition of restitution fines constitutes punishment, and therefore is subject to the proscriptions of the ex post facto clause and other constitutional provisions. [Citations.]" (*People v. Souza* (2012) 54 Cal.4th 90, 143.) Defendant committed his crimes prior to the amendment to the statute. As such, application of the increased minimum fine would violate the prohibition against ex post facto laws.

However, under the language of former section 1202.4, subdivision (b)(1), $200 was the minimum amount the trial court could impose. There is no dispute that the court had the discretion to lawfully impose a greater fine of $240; therefore, there was no ex post facto error because the court imposed a lawfully authorized fine.

Defendant claims that circumstantial evidence supports that the trial court imposed the $240 fine based on the new statute. However, the existence of "[e]rror is never presumed, but must be affirmatively shown, and the burden is upon the appellant to present a record showing it, any uncertainty in the record in that respect being resolved against him." (*People v. Clifton* (1969) 270 Cal.App.2d 860, 862.) Defendant has failed to provide anything in the record before us supporting that the trial court based the restitution fine on the newly amended statute. We will not presume error.

## IX

## DISPOSITION

The sentence on count 8 is vacated, and the matter is remanded to the trial court for resentencing consistent with this opinion.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI
Acting P. J.

We concur:

KING
J.

CODRINGTON
J.

27