Filed 3/26/14  P. v. Smith CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
|    Plaintiff and Respondent, | G047479 |
|      v. | (Super. Ct. No. 09WF1258) |
| TODD LEROY SMITH, | O P I N I O N |
|    Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Dan McNerney, Judge.  Affirmed as modified.

Renee Rich, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

During a fit of anger, appellant Todd Smith fired a gun at his mother and aimed the weapon at his teenage son, resulting in his convictions for attempted murder and aggravated assault. Appellant contends that, due to his attorney's negligence and trial court error, the jury did not have enough information to properly consider his claim the shooting was an accident. We disagree. Although there is merit to appellant's secondary contention that the abstract of judgment must be modified to comport with the trial court's sentencing decision, we affirm the judgment in all other respects.

FACTS

During 2008 and 2009, appellant was feeling down on his luck. A 40-year-old divorcee with severe diabetes, he was unable to work due to charcot neuroarthropathy of the foot and ankle. Despite undergoing multiple surgeries, appellant was still hobbled and in pain, so his mother and stepfather, Debra and Ken Davis, took him into their home and cared for him. They also gave appellant financial support. At the time, Ken was undergoing treatment for cancer, so Debra found herself caring for two men, which was very stressful and created a lot of tension in the household.

Although appellant appreciated all that his mother was doing for him, he didn't particularly like living with her because he felt she was too hard on him and yelled at him too much. At trial, he likened living with Debra to being on an "emotional roller coaster," because he never knew whether things would go well or poorly with her. Yet, because of his health and money problems, he felt dependent on her to a large extent. Feeling helpless and demoralized, appellant spent most of his time in bed and was taking Xanax and painkillers to help him cope with the situation.

The one bright spot in appellant's life was his 15-year-old son Josh. Although Josh lived in Georgia, he and appellant communicated often and seemed to enjoy a pretty good relationship. But when Josh came out to visit appellant in early June 2009, things did not go as expected. Josh had planned on staying with appellant for three weeks, but after a couple of days, they hit a rough patch and things turned ugly.

2

The turning point occurred on the night of June 9, 2009.  That evening, appellant got into an argument with Debra that did not involve Josh.  But in the wake of their fight, Josh isolated himself in his room and refused to speak with appellant.  The next day, appellant tried to initiate conversation with Josh several times.  Josh persistently ignored him and went about playing his video games as if appellant wasn't there.  This made appellant very upset.  In fact, the more Josh ignored him, the angrier he became.

As the day wore on, appellant texted Josh's mother, Tina, to get her advice on how to deal with the situation.  Appellant told Tina that Josh was being a "dick" and that he was about to put him on a plane back to Georgia.  Tina advised appellant to calm down and give Josh some space, but appellant's frustration only increased.  In a series of texts starting around 3:00 p.m., appellant sent Tina the following messages to which she did not reply:  "17 hours now and the little fuck hasn't talked."  "Thanks for answering. I'm going to take drastic action then."  "Obviously from the way he calls you a cunt, he has no respect for you either.  At least he is still alive."  "Tried to be reasonable.  Guess drastic is the way to go."

At approximately 4:00 p.m., Debra and Ken arrived home from a trip to the doctor's office.  Tina called and informed Debra that appellant and Josh were not getting along, so Debra talked to appellant in his room to find out what was going on.  Not getting much out of him, she then talked to Josh in his room.  All he said was that he was bored and wanted go back home to Georgia.  Neither he nor appellant explained to Debra why they were not getting along.

Debra wasn't having any of it.  She marched back into appellant's room and told him to grow up and start getting along with Josh, whom she referred to as an "ungrateful little bastard."  Appellant started talking back to Debra, and they got into a heated exchange.  As they were arguing, appellant said "fuck you all" and grabbed a gun from a tall wire rack next to his bed that contained a computer and other electronic

3

equipment.  With the gun pointed toward Debra, appellant extended his shooting arm out in front of him.  Seeing the weapon, Debra pushed the rack over onto appellant and turned and ran toward the door.  Appellant then fired two shots, seconds apart.  The first shot went into the ceiling, but the second shot came close to hitting Debra.  It landed a foot to the right of the doorway as she was making her way out of the bedroom.[1]

After fleeing appellant's room, Debra ran out into the living room and told Ken to get out of the house, but he stayed inside to find out what was going on.  While hiding in the entryway, he saw appellant walk down the hallway toward Josh's room with the gun in his hand.  Appellant slowly opened Josh's door about a third of the way.  Then he raised his arm and pointed the gun at Josh, who was sitting on his bed.  After a moment, appellant started to lower his arm and close Josh's door a bit.  But then he brought the gun back up and opened the door again.  At that point, Ken jumped appellant from behind and wrapped his hands around the gun.  At Ken's urging, appellant surrendered the weapon to him without a fight.

Appellant was taken into custody at the scene.  When questioned by one of the responding officers about the incident, he said, "It was a big mistake[,] luckily nobody got hurt."  Describing the shooting, he claimed he slipped and squeezed the trigger of his gun as he was falling backwards and did not see where the shots landed.  At another point in the interview, he said, "It wasn't until [Debra] started to push the rack on top of me on the bed that I pulled the gun . . . off the rack.  She kept coming at me like she was going to attack me."

During the interview, appellant seemed coherent and did not display any signs of intoxication.  When the officer asked him if he had been drinking or using any drugs that day, he said no.  However, at trial, appellant testified he was so worked up over Josh on the day of the shooting, he took about 10-12 Xanax, which was three times

---

[1]     The exact location of the bullet mark was 12 inches to the right of the door frame and 58 inches off the floor.

4

his usual amount. He also said that during that time, he was taking painkillers such as Tylenol and codeine to help him cope with his foot pain.

Appellant testified that while arguing with Debra in his room, he "snapped" and grabbed the gun from the rack. However, the only person he intended to shoot was himself. Explaining his actions, appellant claimed he pointed the gun at his head and was about to commit suicide, but then he thought about Josh, changed his mind and fired into the ceiling. After that, he blacked out momentarily. When he came to, he saw the rack falling onto him and got tangled up in some computer cords. Then he blacked out again and heard the second shot go off. At that point, he did not know where Debra was. He claimed he did not remember firing the second shot, but surmised it may have gone off while he was trying to extricate himself from all of the cords. The next thing he knew, he was down by Josh's room and Ken was telling him to let go of the gun, which he did. He does not recall aiming the weapon toward Josh. However, he did realize he had "really screwed up" and wasn't going to be able to stay at Debra's house any longer.

As part of his defense, appellant also presented evidence from psychiatrist Rose Pitt, Ph.D., who evaluated appellant while he was in custody. Dr. Pitt diagnosed appellant as having a mood disorder, anxiety and depression. While appellant was able to deal with these ailments most of the time, Dr. Pitt believed they were greatly exacerbated by his health problems and the stress of being dependent on his mother. Dr. Pitt also opined that extensive and inconsistent usage of Xanax and painkillers can cause confusion, blackouts and memory loss. She testified that people with cognitive impairment do not always weigh the consequences of their actions and are prone to impulsive behavior.

The jury found appellant guilty of attempting to murder Debra with premeditation and deliberation.[2] In addition, the jury convicted appellant of assaulting

---

[2] Appellant was also charged with attempting to murder Josh, but the prosecution dismissed that charge just before opening statements.

Debra and Josh with a firearm and negligently discharging a firearm. The jury also found true allegations that appellant personally discharged and used a firearm during his crimes. The trial court sentenced him to life in prison with the possibility of parole, plus a determinate term of 20 years.

I

Appellant contends the trial court abused its discretion in refusing to let his attorney play two videotapes for the jury during closing argument. The videos depict what appear to be instances of accidental gun discharges. In appellant's view, the videos were critical to help the jury understand and evaluate his accident defense, but we do not see it that way. For the reasons explained below, we uphold the trial court's decision to bar defense counsel from playing the videos during his closing argument.

The firearm used in this case was a Glock 17S semiautomatic handgun, which appellant had purchased about eight months before the shooting. A firearms expert for the prosecution testified he examined the weapon and found it to be in proper working order. Upon testing the gun's action, he determined it would take five and a quarter pounds of pressure to activate the trigger, which is in the normal range. However, that number could vary, depending on how the shooter's finger was positioned on the trigger. The expert also stated that, while he had worked on several cases where a Glock handgun had been accidentally discharged, he had never seen a case where two shots were fired during an accidental discharge.

During closing argument, defense asserted appellant lacked the intent to kill. Although the second shot nearly struck Debra, counsel argued appellant fired it accidentally when the rack hit his arm or he was trying to detangle himself from the computer cords. In order to give the jury "some idea of how easy it is" for a gun to accidentally discharge, defense counsel intended to play two videos he "pulled off the internet." The prosecutor objected on the basis the videos were never admitted into evidence. At that point, the court excused the jury for a lunch break. During the break,

6

the court reviewed the videos and discussed with counsel the propriety of showing them to the jury.[3]

The first video only lasts about 10 seconds. It shows a man walking outdoors with a pistol in his hand. The man trips, and upon hitting the ground, his gun goes off, and he appears to be startled by the discharge. Defense counsel argued the point of the video was to demonstrate "it's easy to accidentally discharge a firearm, just like [appellant] did [with] the second round." In response, the prosecutor noted, "We don't know if [the gun in the video] was ever tested, if it was in working order, if it was modified." Beyond that, the trial court was concerned that the scenario presented in the video did not bear any similarity to the facts of this case. Thinking the jurors might be confused by the video, the court denied defense counsel's request to show it to them.

The second video shows a DEA agent talking to students in a classroom setting about the danger of guns. The agent shows the class a Glock handgun, which he says is unloaded. But while he is handling the weapon, the gun goes off, startling the students. Following the shot, the agent continues on with his presentation, but he also appears to be in pain. It is unclear from the footage whether he was actually shot or was simply faking an accidental discharge to demonstrate the dangerousness of firearms. Defense counsel argued that, either way, the video was probative to show the ease with which a Glock could be accidentally discharged. However, the prosecutor argued that defense counsel didn't need the video to get that point across to the jury. In her view, the video would only serve to confuse the jurors and mislead them in their quest to decide the issues before them. The trial judge added an additional concern. Because the video was

---

[3] The videos were marked as exhibits and transmitted to this court on appeal. We have reviewed them, as well.

7

not admitted into evidence, he determined it should not be shown to the jury because it was not subjected to the adversarial process.[4]

Appellant contends the ruling was in error. Although the videos were never admitted into evidence, he argues he had the right to show them to the jury because they illustrated a matter of common knowledge and experience that was relevant to his defense. (See *People v. Farmer* (1989) 47 Cal.3d 888, 922, disapproved on other grounds in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6 [trial court may not prohibit reference to demonstrative materials in closing argument simply because they were not admitted into evidence].) In so arguing, appellant draws our attention to identification cases which have upheld the right of defense attorneys to allude to news accounts of incidents of misidentification in their closing arguments. (See, e.g., *People v. Guzman* (1975) 47 Cal.App.3d 380, 392, disapproved on other grounds in *People v. McDonald* (1984) 37 Cal.3d 351, 362, fn. 8.) However, as appellant admits, the issue of whether extraneous materials may be presented to the jury during closing argument is factually intensive and one over which the trial court has considerable discretion. (*People v. West* (1983) 139 Cal.App.3d 606, 610-611.) A court may properly prohibit counsel from utilizing materials that are factually unrelated to the issues at hand and would only serve to confuse the jury with irrelevant information. (*People v. Mendoza* (1974) 37 Cal.App.3d 717, 725; *People v. Pelayo* (1999) 69 Cal.App.4th 115, 122.)

Here, the videos defense counsel wanted to show the jury were factually dissimilar to the circumstances surrounding appellant's alleged gun use. Whereas appellant claimed his gun accidentally went off due to the rack and its contents falling on him, the videos depicted a man falling down and a man giving a talk on gun safety. And based on the record presented below, there is no way of knowing if those videos were

---

[4] Despite this ruling, defense counsel was allowed to argue to the jury that "[a]ccidental discharges happen all the time. We see it on the news, on the internet, on the TV about accidental [dis]charges [and] that police officers can even accidentally shoot their gun."

8

real or staged, or, as the prosecutor observed below, whether the guns in them had been modified in some fashion.

Assuming the videos were real, it is clear that in the second one, the DEA agent thought the gun he was handling was unloaded. There is a big difference between pulling the trigger on a gun which is believed to be unloaded and activating a trigger involuntarily in response to the application of some external force, which is what appellant claimed he did in this case. For all of these reasons, we find no abuse of discretion in the trial court's decision to bar defense counsel from showing the videos to the jury. It's not simply that the videos were not admitted into evidence; rather, they were just not shown to be similar enough to the evidence and arguments presented at trial to mandate their consideration in closing argument.

II

Appellant also claims his attorney was ineffective for failing to request a jury instruction on the defense of accident. We disagree.

According to Debra's testimony, appellant grabbed the gun while they were arguing, said "fuck you all," and pointed the weapon at her. Then, as appellant was raising his gun hand up toward her, she pushed the rack on him and turned quickly toward the door. While she was in the doorway, she heard two shots ring out in rapid succession; the first one went into the ceiling and the second missed her by about a foot.

Appellant claimed he was trying to commit suicide but changed his mind at the last minute and fired the first shot into the ceiling. Then he blacked out for a moment and came to as the rack was falling onto him. Although he doesn't remember firing the second shot, he surmised it went off as he was trying to free himself from the computer cords. He testified the only person he thought about hurting was himself, and he had no intention of harming his mother.

Consistent with appellant's testimony, defense counsel argued to the jury that appellant was not guilty of attempted murder because the second shot was "clearly

9

accidental" and he lacked the intent to kill.  However, defense counsel did not ask the trial court to instruct the jury on the defense of accident.  Recognizing the trial court is not required to give that instruction absent a request from counsel (*People v. Anderson* (2011) 51 Cal.4th 989, 996), appellant contends his attorney was ineffective for failing to request an accident instruction on his behalf.

"""In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was 'deficient' because his 'representation fell below an objective standard of reasonableness . . . under prevailing professional norms.' [Citations.]"""  (*People v. Lucas* (1995) 12 Cal.4th 415, 436.)  The defendant must also affirmatively establish prejudice.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687.)  To do this, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  (*Id*. at p. 694.)

We agree with appellant that his attorney was remiss for failing to request a jury instruction on the defense of accident.  Based on appellant's testimony that he doesn't remember firing the second shot and that it went off while he was tangled up in the computer cords, there was sufficient evidence to justify an accident instruction in this case.  (See *People v. Lewis* (2001) 25 Cal.4th 610, 646 ["The testimony of a single witness, including the defendant, can constitute substantial evidence" to warrant jury instructions on a particular defense]; *People v. Petznick* (2003) 114 Cal.App.4th 663, 677 [doubts about the sufficiency of the evidence to warrant instructions on a particular defense should be resolved in favor of the defendant].)

However, we do not believe it is reasonably probable appellant would have obtained a more favorable verdict had an accident instruction been given.  "The accident defense is a claim that the defendant acted without forming the mental state necessary to make his actions a crime."  (*People v. Gonzales* (1999) 74 Cal.App.4th 382, 390.)  The

defense applies only "when it appears that there was no evil design, intention, or culpable negligence" attendant to the defendant's actions. (Pen. Code, § 26.)

Here, there was plenty of evidence that appellant harbored evil intent in shooting at his mother. Although Debra had been caring for him for months, appellant resented her because he felt dependent on her and she yelled at him sometimes. In fact, immediately before the shooting occurred, appellant was in a heated argument with Debra because he and Josh were not getting along. It is clear from appellant's text messages to his ex-wife Tina on the day of the shooting he was very angry and thinking about taking "drastic" action. Also, according to Debra's testimony, appellant said, "fuck you all" and pointed the gun at her just before she pushed the rack onto him and ran. Lucky for her, she wasn't injured, but the second shot missed her by only about a foot. Taken together, this is strong evidence appellant's actions arose from anger and frustration and were not the result of an accident.

Moreover, although the trial court did not give a specific jury instruction on the defense of accident, the essence of that defense — that appellant lacked the intent to kill — was effectively encompassed in the court's instructions on attempted murder. By finding appellant guilty of that offense, the jury not only determined he intended to kill Debra, but that he tried to kill her in a deliberate and premeditated manner. This finding is fundamentally inconsistent with, and shows the jury necessarily rejected, appellant's accident defense. Therefore, defense counsel's failure to seek an accident instruction was not prejudicial and is not cause for a reversal. (*People v. Jones* (1991) 234 Cal.App.3d 1303, 1313-1316, disapproved on other grounds in *People v. Anderson, supra*, 51 Cal.4th at p. 998, fn. 3 [trial court's failure to instruct on defense of accident and misfortune deemed harmless where the jury necessarily resolved the underlying factual question of the defense against the defendant by finding him guilty of attempted premeditated murder].)

11

III

Reiterating the arguments addressed in the preceding two sections, appellant asserts the cumulative effect of barring the use of his proposed videos in closing argument and the absence of an accident instruction violated his constitutional right to a fair trial and to present his defense. This assertion is based on the premise it was error to bar the videos, and his attorney was ineffective for failing to request an accident instruction. However, as we have shown, that premise is incorrect.

In any event, it is clear that although defense counsel was not allowed to show the jury his proposed videos on accidental discharge, he was allowed to argue his point that guns are sometimes discharged by accident. (See, *ante,* p. 8, fn. 4.) And despite the fact defense counsel did not seek a jury instruction on the defense of accident, he did present that defense to the jury, and the factual issue underlying it, i.e., the issue of intent, was resolved against appellant through other properly given instructions. That being the case, we do not believe appellant's constitutional rights were violated. Whether considered individually or together, the alleged errors discussed in the preceding two sections do not warrant reversal.

IV

Next, appellant claims the trial court prejudicially erred in failing to modify the standard instruction on voluntary intoxication so as to allow the jury to consider his intoxication in determining whether he made any false statements reflecting consciousness of guilt. The claim is not well taken.

At trial, appellant testified he grabbed the gun from his rack before Debra pushed the rack over onto him. He suggested the second shot discharged accidentally due to the rack and its contents falling onto him. However, after he was taken into custody, appellant told the police it wasn't until after Debra pushed the rack onto him that he grabbed the gun. He made it sound like he pulled the trigger in self-defense because Debra kept coming at him, "like she was going to attack [him]."

12

Based on these discrepancies, the trial court instructed the jury pursuant to CALCRIM No. 362 that if appellant "made a false or misleading statement before the trial relating to the crime charged, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt."

Per CALCRIM No. 3426, the trial court also instructed the jurors they could consider evidence of appellant's intoxication in deciding whether he acted with intent to the kill and/or premeditation and deliberation. However, the court prohibited the jury from considering appellant's intoxication for any other purpose.

Relying on *People v. Wiidanen* (2011) 201 Cal.App.4th 526 (*Wiidanen*), appellant contends the trial court should have modified CALCRIM No. 3426 so as to allow the jury to consider his intoxication in determining whether he *knowingly* made any false or misleading statements reflecting consciousness of guilt. Indeed, *Wiidanen* recognized it is logically inconsistent to allow the jury to infer a consciousness of guilt if it finds the defendant knowingly made a false or misleading prior statement, but to preclude it from considering defendant's intoxication at the time the statement was made. (*Id*. at p. 533.) We agree with *Wiidanen* that "a defendant's false or misleading statements made when he was intoxicated may not be probative of the defendant's veracity, if the jury believed the defendant was too intoxicated to know his statements were false or misleading." (*Ibid*.)

However, we also agree with *Wiidanen* that the failure to allow the jury to consider the defendant's intoxication in determining whether he knowingly made any false or misleading statements is not grounds for reversal if, based on the facts adduced at trial, it is reasonable to infer the defendant was aware of his guilt at the time he made the statements. (*Wiidanen, supra*, 201 Cal.App.4th at pp. 533-534.) No due process violation will be found if the evidence shows the statements in question were designed to

13

deceive, as opposed to simply reflecting the meaningless ramblings of someone who is too intoxicated to really know what they are talking about. (*Ibid*.)

Appellant testified he took about 10-12 Xanax on the day of the shooting, which was three times his usual amount. He also said he was taking painkillers to help him deal with his foot pain. If true, this would support an inference appellant's cognitive abilities were impaired at the time he spoke with the police at the scene of the crimes. However, during his interview, appellant told the investigating officer that he had *not* used any drugs or alcohol that day. In fact, he said he had not had anything to drink in "1,027 days," which according to appellant's testimony, was true to the day.[5] This suggests appellant's thought processes were not clouded by his alleged drug use.

As a matter of fact, the investigating officer did not detect any signs that appellant was under the influence. Appellant was able to answer his questions coherently and was fully aware he might be in trouble for what he did because, during the interview, he asked if he was going to be arrested. After the officer said he didn't know, appellant claimed that just before the shooting, Debra pushed the rack over on top of him and "kept coming at [him] like she was going to attack [him]." However, appellant did not allege, nor did the evidence at trial show, that he fired his gun in self-defense. The fact that he was able to concoct an exculpatory explanation for his actions when interviewed by the police suggests he was in command of his faculties at that time.

Suffice it to say, the inference that appellant was aware of his guilt when he made the false statements to the investigating officer was entirely reasonable in light of the facts adduced at trial. Accordingly, the failure to modify the instruction on voluntary intoxication is not cause for reversal. It is simply not reasonably probable appellant would have obtained a more favorable result had the jury been instructed to consider his

---

5        Appellant testified he gave up drinking on August 18, 2006, which is exactly 1,027 days before this case arose.

14

alleged intoxication in determining whether he knew his statements to the police were false at the time he made them.  (*Wiidanen, supra*, 201 Cal.App.4th at p. 534.)

V

At sentencing, the trial judge ordered appellant to pay restitution and parole revocation fines in the amount of $200 each.  However, the minute order of the sentencing hearing and the abstract of judgment state the fines were for $240 each. Appellant contends the minute order and abstract should be modified to comport with the trial judge's oral recitation.  We agree.

"Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls. [Citations.]"  (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.)  The Attorney General asks us to depart from this rule because at the time appellant was sentenced in 2012, the statutorily prescribed minimum restitution and parole revocation fines were $240.  (Pen. Code, §§ 1202.4, subd. (b)(1), 1202.45, subd. (a); *People v. Holman* (2013) 214 Cal.App.4th 1438, 1452, fn. 3.)  According to the Attorney General, "Because the minimum fine was $240 [at the time of sentencing], the $200 fine orally imposed was unauthorized and improper."

However, the controlling date for determining the amount of a sentencing fine is the date of the defendant's offenses.  (*People v. Souza* (2012) 54 Cal.4th 90, 143; *People v. Valenzuela* (2009) 172 Cal.App.4th 1246, 1248; *People v. Saelee* (1995) 35 Cal.App.4th 27, 30–31.)  Even if the amount of the fine increases from the time of the offenses to the time of sentencing, ex post facto principles preclude imposition of the increased amount.  (*Ibid*.)  Given that the minimum amount of appellant's fines was only $200 when he committed his crimes in 2009 (Pen. Code, § 1202.4, former subd. (b)(1); *People v. Holman, supra,* 214 Cal.App.4th at p. 1452, fn. 3), the trial court's oral pronouncement was not erroneous.

We recognize $200 was the *minimum* amount authorized by law at that time.  But there is nothing in the record to suggest, nor does the Attorney General contend, the trial judge intended to fine appellant in an amount greater than the statutory minimum.  That being the case, there is no reason to disturb the trial judge's ruling.

The Attorney General also argues appellant forfeited his right to challenge the amount of his fines because he did not object to them in the trial court.  But there was no reason for appellant to object at the sentencing hearing because, as we have explained, the trial court imposed fines that were lawfully authorized based on when the underlying crimes were committed.  Under these circumstances, the forfeiture rule does not apply.

DISPOSITION

The minute order of the sentencing hearing and the abstract of judgment are modified to reflect the trial court ordered appellant to pay restitution and parole revocation fines in the amount of $200 each.  The clerk of the superior court shall prepare an amended abstract of judgment reflecting this modification and send a certified copy to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


BEDSWORTH, ACTING P. J.


WE CONCUR:


IKOLA, J.


THOMPSON, J.


16